*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 27**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

PHILIP RUTHERFORD and WENDY RUTHERFORD,
*Respondents,*

*v.*

TALISKER CANYONS FINANCE, CO., LLC; ASC UTAH, LLC; and
SUMMIT SKI TEAM, INC.,
*Petitioners.*

No. 20140917
Filed June 27, 2019

On Certiorari to the Utah Court of Appeals

Third District, Summit County
The Honorable Todd M. Shaughnessy
No. 100500564

Attorneys:

David A. Cutt, David S. Kottler, Salt Lake City, for respondents

Justin J. Keys, Eric P. Lee, Park City, Timothy C. Houpt, Salt Lake
City, for petitioners

JUSTICE HIMONAS authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUSTICE PETERSEN
joined, and which ASSOCIATE CHIEF JUSTICE LEE joined as to Part I.

ASSOCIATE CHIEF JUSTICE LEE authored an opinion dissenting in
part.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1    Young Levi Rutherford crashed and was injured when he skied into a patch of thick, wet, machine-made snow. His parents brought claims for negligence and premises liability on his behalf against Talisker Canyons Finance Company and ASC Utah (collectively, Talisker). Talisker asks us to hold that the Rutherfords' claims are barred by (1) a release of liability signed by Levi's father or, alternatively, (2) Utah's Inherent Risks of Skiing Act, Utah Code sections 78B-4-401 to -404 (the Act). We decline Talisker's invitations.

¶2    Two of our decisions compel this result. First, in *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, 37 P.3d 1062, *superseded by statute as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984,[1] we unambiguously declared that it would violate public policy to allow a parent to "release a minor's prospective claim for negligence." *Id.* ¶ 10. Second, in *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991), we unanimously held that claims for injuries caused by "inherent risks of skiing" are barred only to the extent that the risk was integral to the sport of skiing. *Id.* at 1044–45. And three years later we loudly reaffirmed our commitment to *Clover* in *White v. Deseelhorst*, 879 P.2d 1371 (Utah 1994), *abrogated on other grounds by Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, 423 P.3d 1150. Today, Talisker asks us to abandon our holding in *Clover* and turn turtle three decades of precedent and the settled expectations of skiers and the ski industry in favor of an alternate approach to interpreting the Act. But because of our established practices in statutory construction and precedential decisions in *Clover* and *White*, we reject this substitute construction.

¶3    Instead, we hold that Talisker has not convinced us that *Clover* was wrong, much less met its heavy burden to persuade us to overturn such weighty precedent. We therefore uphold the court of appeals' decision that the district court was correct to apply *Clover*. We do, however, take this opportunity to streamline the

---

[1] *Hawkins* has been superseded by statute—Limitations on Liability for Equine and Livestock Activities, Utah Code sections 78B-4-201 to -203—albeit only with respect to defined equine and livestock activities. *See infra* ¶¶ 21–22.

implementation of *Clover*'s holding and remand this case to the district court with instructions to apply *Clover* in a manner consistent with this opinion. We also agree with the court of appeals' conclusion to affirm the district court's partial grant of summary judgment to the Rutherfords, finding the release unenforceable under Utah law—although we do so for reasons other than those stated by the court of appeals.

## BACKGROUND

¶4 Ten-year-old Levi Rutherford was a member of the Summit Ski Team, an affiliate of the United States Ski and Snowboard Association (USSA), during the 2009–2010 winter season. Levi was an advanced skier who regularly skied "on the double blacks, which were the expert runs." Levi's father signed him up for the team online in the fall of 2009. In the process, Levi's father signed an "Assumption of Risk and Release of Liability" on Levi's behalf. The release purported to waive Levi's right to sue USSA, the ski team, and any ski area operator for any injury due to any reason, including the negligence of one of the above-named entities.[2]

---

[2] The Rutherfords argue that the "Assumption of Risk and Release of Liability" submitted by Talisker is not the one that Levi's father signed. In the district court, USSA submitted an affidavit declaring that the release submitted was the one signed by Levi's father. Levi's father submitted an affidavit stating that while he "recall[s] reading at least part of a release page on USSA's website," he "do[es] not recall signing the" release submitted by USSA. We do not find any dispute of material fact as Levi's father claims only that he does not remember signing this specific release, while USSA presented evidence that he did approve the release. A failure of memory does not create a disputed fact. *See Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 541 (5th Cir. 2015) ("Lack of memory by itself is insufficient to create a genuine dispute of fact."); *Shiozawa v. Duke*, 2015 UT App 40, ¶ 26, 344 P.3d 1174 (finding no dispute of fact when witness "testified only that he did not remember" a specific fact). This remains true here, particularly given that, on review of cross-motions for summary judgment, "we view the facts in the light most favorable to

(cont.)

¶5    On January 15, 2010, Levi's parents dropped him off at The Canyons ski resort for ski team practice.[3] Levi met up with his coaches, who told him to take a warmup run while they set up gates for training on the Retreat run. At this time, multiple snow-making machines were in operation on Retreat. The coaches did not ask The Canyons to turn off the snow-making machines because "in the past [The Canyons] kept running the snow guns until they saw that people were up there . . . and then they would shut them off when they saw that [the ski team] was on that run." The coach in charge of training that day testified in her deposition that she would not have had the team ski through the gates if the snow-making machines were still running by the time the course was set up "[b]ecause of [the] bad visibility and inconsistent snow."

¶6    Levi took his warm up on Retreat while the snow-making machines were in operation, making visibility poor. Warning signs were posted at the top of the run, stating: "snowmaking in progress." Despite the warning, Levi headed down Retreat without making turns. He went into a tuck position with his knees bent, his poles tucked under his arms, and his head near his knees. Near the bottom of the run, Levi ran into a mound of sticky, wet, machine-made snow that was roughly a foot high, which caused him to crash. Levi sustained a brain injury from the crash.

¶7    The Rutherfords filed suit on Levi's behalf against the ski team and Talisker. After discovery, the parties filed multiple cross-motions for summary judgment. At issue here are the motions concerning whether the Rutherfords' claims for negligence and premises liability against Talisker are barred either by the release signed by Levi's father or by the Act.

¶8    Regarding the arguments for the release, the district court read this court's precedent in *Rothstein v. Snowbird Corp.*, 2007 UT 96, 175 P.3d 560, as meaning that all preinjury releases for recreational skiing are unenforceable, while, pursuant to *Berry v. Greater Park City Co.*, 2007 UT 87, 171 P.3d 442, *abrogated on other*

---

[Talisker, as] the losing party." *Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 16 n.10, 337 P.3d 213.

[3] Both defendants Talisker Canyons Finance Company and ASC Utah were doing business as The Canyons at the time the events in this case took place.

*grounds by Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, 423 P.3d 1150, preinjury releases for competitive skiing are enforceable. Based on this understanding, the district court held that the preinjury release signed by Levi's father was unenforceable because the type of skiing Levi was engaged in at the time he crashed was more similar to recreational skiing than competitive skiing. The district court alternatively held that the release was unenforceable under *Hawkins ex rel. Hawkins v. Peart*, which held that a preinjury release signed by a parent on behalf of a minor was unenforceable for violating Utah public policy. 2001 UT 94, 37 P.3d 1062, *superseded by statute as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984.[4]

¶9 The district court also denied Talisker's motion in which it argued that the Act's machine-made snow exemption[5] barred the Rutherfords' claims. The court held that, pursuant to *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991), there was a disputed question of material fact as to whether a skier wished to confront sticky, wet, machine-made snow from a machine that was allegedly

---

[4] As previously noted, *supra* ¶ 2 n.1, and as stated in *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984, *Hawkins* has been superseded by statute, Limitations on Liability for Equine and Livestock Activities, Utah Code sections 78B-4-201 to -203. And at first glance, the district court's ruling appears to be in potential conflict with *Penunuri*. This is not the case. On October 15, 2012, the district court ruled on the enforceability of the release, which relied on our holding in *Hawkins*. *Penunuri*, which acknowledged that the amended statute "effectively overrule[d] our conclusion in *Hawkins*," was not issued until April 9, 2013. 2013 UT 22, ¶ 21 n.43. The Rutherfords argue that we can and should reconcile our holdings in *Hawkins* and *Penunuri* in this case by holding that "pre-injury releases signed by a parent on behalf of a minor are void and unenforceable as contrary to public policy," and that this rule is altered only when "a statute is amended to" make such releases enforceable. We agree. *See infra* ¶¶ 21–22.

[5] The Act's "machine-made snow exemption" refers to Utah Code section 78B-4-402(1)(b), which includes "machine-made snow" in the Act's exemplary list of the "inherent risks of skiing."

"not functioning properly" and whether that risk could be eliminated through the exercise of reasonable care.

¶10 Talisker appealed the district court's partial grant of the Rutherfords' motion for summary judgment and its denial of Talisker's motion for summary judgment. The court of appeals affirmed the district court's rulings.

¶11 With respect to the preinjury release, it affirmed on the ground that the 2006 amendment to the Act, coupled with our analysis in *Rothstein*, effectively overruled *Berry* and eliminated the distinction between preinjury releases for recreational and competitive skiing, making both types of releases unenforceable. *Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co.*, 2014 UT App 190, ¶¶ 34–35, 333 P.3d 1266. Additionally, the court of appeals "reject[ed] the trial court's determination that the . . . release is unenforceable because it was signed by a parent on behalf of a minor; rather, the release is unenforceable based on the Act's policy statement." *Id.* ¶ 30. We granted certiorari to review the court of appeals' decision. Based on our review, we hold that the court of appeals reached the correct result, but that its declaration that preinjury releases signed by parents on behalf of children do not generally offend Utah's public policy was in error.

¶12 The court of appeals also affirmed the district court's ruling with respect to the Act's machine-made snow exemption, stating that there is a "question[] of fact regarding the applicability of the machine-made snow exemption" in the Act. *Id.* ¶ 18. We affirm the court of appeals' and the district court's reliance on *Clover* in making this determination. However, we take this opportunity to clarify the implementation of *Clover*'s core holding and therefore remand this case to the district court to make a determination under *Clover* consistent with this opinion.

¶13 We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶14 On certiorari, we review the decision of the court of appeals for correctness, "giving no deference to its conclusions of law." *State v. Harker*, 2010 UT 56, ¶ 8, 240 P.3d 780 (citation omitted) (internal quotation marks omitted). "Additionally, [with respect to the decision of the district court,] we 'apply the same standard of review used by the court of appeals.'" *Energy Claims Ltd. v. Catalyst*

*Inv. Grp. Ltd.*, 2014 UT 13, ¶ 17, 325 P.3d 70 (citation omitted). And when, as here, "there are cross-motions for summary judgment, we view the facts in the light most favorable to the losing party." *Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 16 n.10, 337 P.3d 213 (citation omitted).

## ANALYSIS

¶15 We first examine whether the release is enforceable. It is not. Absent a relevant, contrary expression of intent from the legislature, we adhere to our pronouncement in *Hawkins ex rel. Hawkins v. Peart* that a parent cannot release his or her minor child's prospective claims for negligence. 2001 UT 94, 37 P.3d 1062, *superseded by statute as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984.

¶16 Second, we turn to interpreting the Act, relying on our time-honored tools of *stare decisis* and statutory interpretation. For purposes of our opinion today, we begin with our precedential tools. We do so because in *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991), this court has already done much of the important work of interpreting the Act. And we find its reasoning both reasonable and persuasive, especially in light of the ambiguity in the Act's construction and the historical context in which it was enacted. With this in mind, and in accord with our case law, we see no reason to abandon the *Clover* court's core interpretation of the Act.

¶17 We do, however, take this opportunity to clarify the test announced in *Clover* in a way that implements the core holding of *Clover* by simplifying *Clover*'s two-prong subjective–objective inquiry into a one-step objective inquiry. We believe this clarification respects both the core holding of *Clover* and the language of the Act. Accordingly, we remand this case to the district court for a ruling consistent with this opinion.

## I. PREINJURY RELEASES SIGNED ON BEHALF OF MINOR CHILDREN VIOLATE PUBLIC POLICY

¶18 The release signed by Levi's father violates public policy and is not enforceable. "Preinjury releases from liability for one's negligence pit two bedrock legal concepts against one another: the right to order one's relationship with another by contract and the obligation to answer in damages when one injures another by breaching a duty of care." *Rothstein v. Snowbird Corp.*, 2007 UT 96,

¶ 6, 175 P.3d 560. With this tension in mind, we have stated that preinjury releases are enforceable unless the party challenging the release establishes an exception to that rule. *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 14, 179 P.3d 760 ("[P]eople may contract away their rights to recover in tort for damages caused by the ordinary negligence of others.") *abrogated on other grounds by Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, 423 P.3d 1150; *Berry v. Greater Park City Co.*, 2007 UT 87, ¶ 12, 171 P.3d 442 ("[A] person should retain the power to contract away the right to recover damages for the negligence of another" but that right is "subject to many conditions and limitations."), *abrogated on other grounds by Penunuri*, 2017 UT 54.

¶19 Preinjury releases are generally governed by contract law. *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, ¶ 5, 37 P.3d 1062 ("[P]arties may obtain contractual releases from liability for negligent action . . . where one party agrees to release the other from liability for future injuries."); *Jacobsen Constr. Co. v. Structo Lite Eng'g, Inc.*, 619 P.2d 306, 310 (Utah 1980) (noting that "the field of contract law is more than adequate to deal with" preinjury releases). Nevertheless, preinjury releases remain subject to several exceptions. We have previously identified three such exceptions to preinjury release enforceability: "(1) releases that offend public policy . . . (2) releases for activities that fit within the public interest exception . . . and (3) releases that are unclear or ambiguous." *Pearce*, 2008 UT 13, ¶ 14 (citations omitted). And while some jurisdictions conflate the public interest and public policy exceptions,[6] we have expressly distinguished the two in the context of preinjury releases. *See id.*; *see also Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 25, 301 P.3d 984.

---

[6] *See, e.g.*, *Brown v. Soh*, 909 A.2d 43, 48 (Conn. 2006) (applying *Tunkl* public interest factors to determine whether "contract[] violate[d] public policy" (citation omitted) (internal quotation marks omitted)); *Ash v. N.Y. Univ. Dental Ctr.*, 564 N.Y.S.2d 308, 313 (N.Y. App. Div. 1990) (applying *Tunkl* public interest factors but holding that release was "invalid as a matter of public policy"); *Olson v. Molzen*, 558 S.W.2d 429, 432 (Tenn. 1977) (analyzing release under "public interest" factors but holding that release was "contrary to public policy").

¶20 Our public interest exception applies the six-factor test found in *Tunkl v. Regents of University of California*, 383 P.2d 441, 444–47 (Cal. 1963), which was adopted in *Berry*, 2007 UT 87, ¶ 15, and further analyzed in *Pearce*, 2008 UT 13, ¶¶ 16–21. In contrast, the public policy exception remains "a doctrine of vague and variable quality" based on "constitutional or statutory provisions or the common law." *Penunuri*, 2013 UT 22, ¶ 26 (citations omitted) (internal quotations marks omitted). This delineation between the two standards is necessary to maintain the "fluid nature" of the public policy defense, available in other contract claims, and to avoid the conflation of that defense with the six *Tunkl* factors. *Cf. Wolf v. Ford*, 644 A.2d 522, 527 (Md. 1994).[7]

¶21 In the context of releases signed by parents on behalf of minors, we have unambiguously held that preinjury releases for negligence violate public policy. *See Hawkins*, 2001 UT 94, ¶ 13. We based our conclusion on a number of observations, all of which remain equally forceful today. First, Talisker "has cited no source of law, and we are aware of none, granting parents in Utah a general[,] unilateral right to compromise or release a child's existing causes of action without court approval or appointment to that effect." *Id.* ¶ 11. Quite to "the contrary, Utah law provides various checks on parental authority to ensure a child's interests are protected." *Id.* Indeed, "[u]nder the Uniform Probate Code, for example, when a minor has a cause of action, the minor or another

---

[7] To address such concerns, some of the jurisdictions that conflate public interest and public policy do not limit their public policy exception to the six factors laid out in *Tunkl*. *See Brown*, 909 A.2d at 48 (holding that a "totality of the circumstances" test is to be applied, which may include analysis of the six factors); *Wolf*, 644 A.2d at 527 (stating that the six factors may be "considered by a court in determining whether a given transaction involves public interest, but the six factors are not conclusive"); *Vodopest v. MacGregor*, 913 P.2d 779, 786 (Wash. 1996) (en banc) (stating that the *Tunkl* factors "are not the exclusive considerations to which a court may look in the determination of public policy"). Even *Tunkl* itself states that "[n]o definition of the concept . . . can be contained within the four corners of a formula;" rather, the six factors are merely a "rough outline" of when an "exculpatory provision[] will be held invalid." 383 P.2d at 444–45.

person interested in the minor's welfare may petition for the appointment of a conservator." *Id.*; *see also* UTAH CODE § 75-5-404. "Significantly, a parent may act as a minor's conservator, not as a matter of right, but only when appointed by the court." *Hawkins*, 2001 UT 94, ¶ 11; *see* also UTAH CODE § 75-5-410(1). Furthermore, "we see little reason to base the validity of a parent's contractual release . . . on the timing of [the] injury. Indeed, the law generally treats preinjury releases . . . with greater suspicion than postinjury releases." *Hawkins*, 2001 UT 94, ¶ 13.[8]

¶22 Talisker raises but one argument in opposition. According to Talisker, by superseding *Hawkins* with respect to certain equine and livestock activities, the legislature has made clear that preinjury releases signed by parents on behalf of their children do not offend public policy. Talisker's logic does not follow, and this argument may hurt Talisker's case more than it helps. Indeed, it is difficult to logically conclude that the legislature's decision to allow for preinjury releases by parents for minors in one very narrow area translates to a general policy that all such preinjury releases are valid. The conclusion that the legislature meant to say that preinjury releases signed by parents for minors are valid only in the unique context of equine activities is equally likely. In short, the legislature's action sheds no light on its view of the public policy surrounding the larger question, and, absent any positive signal from the legislature, we are loath to forsake *Hawkins* and its reasoning.

---

[8] Just as at the time we handed down *Hawkins*, the view that parental releases are not enforceable appears to continue to enjoy the support of a large majority of jurisdictions to take up the issue. *See Hawkins*, 2001 UT 94, ¶ 10 ("A clear majority of courts treating the issue have held that a parent may not release a minor's prospective claim for negligence."); *see also Rosen v. B.J.'s Wholesale Club, Inc.*, 51 A.3d 100, 107 (Md. Ct. Spec. App. 2012) ("[W]e find that a substantial majority of the state courts that have squarely considered whether a release agreement may bar future negligence claims of a child have held that such agreements are invalid and unenforceable on public policy grounds."), *rev'd*, 80 A.3d 345 (Md. 2013).

¶23 Having concluded that the preinjury release Levi's father signed on Levi's behalf does not preclude the Rutherfords' claims, we turn to Talisker's argument that the Act stands as a bar to the Rutherfords' claims.

## II. *CLOVER* IS ENTITLED TO *STARE DECISIS* RESPECT

¶24 The district court denied Talisker's motion for summary judgment on the issue of negligence and premises liability based on this court's decision in *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991), holding that there remained an issue of disputed material fact regarding the Act's machine-made snow exemption that precluded summary judgment. The court of appeals affirmed the denial on the same grounds. *See Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co.*, 2014 UT App 190, ¶ 18, 333 P.3d 1266.

¶25 In a supplemental briefing order, we invited the parties to brief the court on whether the test set forth in *Clover* should be repudiated or modified in any way. We also invited the parties to brief the court on what role *stare decisis* should play in consideration of that question.

¶26 Having considered the parties' arguments and reviewed *Clover* at great length, we now hold that *Clover* should not be repudiated. Instead, we offer clarification on the implementation of *Clover*'s holding. Principles of *stare decisis* compel this result.

### A. Stare Decisis *Framework*

¶27 "[W]e do not overrule our precedents lightly." *State v. Guard*, 2015 UT 96, ¶ 33, 371 P.3d 1 (citations omitted) (internal quotation marks omitted). The stability and legitimacy of our legal system requires us to undertake the review of precedents in a spirit of deference and humility. *See State v. Walker*, 2011 UT 53, ¶ 68, 267 P.3d 210 (Lee, J., concurring); *see also* Learned Hand, *The Spirit of Liberty*, *in* THE SPIRIT OF LIBERTY: PAPERS AND ADDRESSES OF LEARNED HAND 189, 190 (Irving Dillard ed., 3d ed. 1960) ("The spirit of liberty is the spirit which is not too sure that it is right."). Concomitantly, "[t]hose asking us to overturn prior precedent have a substantial burden of persuasion." *Met v. State*, 2016 UT 51, ¶ 43, 388 P.3d 447 (quoting *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994), *superseded by constitutional amendment as stated in State v. Legg*, 2018 UT 12, 417 P.3d 592) (internal quotation marks omitted). And as a result, "unless and until a party meets its burden of establishing that our prior case law is unworthy of *stare decisis*

respect," *Waite v. Labor Comm'n*, 2017 UT 86, ¶ 88, 416 P.3d 635 (Pearce, J., concurring) (emphasis added), we do not overturn "weighty precedent[],"*Eldridge v. Johndrow,* 2015 UT 21, ¶ 22, 345 P.3d 553; *see also Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 57, 416 P.3d 663 ("We . . . don't overrule our precedents unless they've proven to be unpersuasive and unworkable, create more harm than good, and haven't created reliance interests."). Indeed, "[t]o reverse course, we require as well what we have termed a 'special justification'—over and above the belief 'that the precedent was wrongly decided.' . . . What is more, *stare decisis* carries enhanced force when a decision . . . interprets a statute." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015) (citation omitted).[9]

---

[9] Our case law, and case law from around the country, has engaged with the idea that a court's interpretation of a legislative enactment is subject to heightened *stare decisis. See Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1283 (Utah 1987) (Zimmerman, J.) (noting that in determining whether to overturn a prior decision, "[t]he answer must take into account the fact that we are not dealing with an interpretation of the common law . . . [;] [r]ather we are dealing with an interpretation of a statute"); *id.* at 1288 (Howe, J., concurring in result) ("The doctrine of *stare decisis*, weighty in any context, is especially so in matters of statutory construction." (emphasis added) (citation omitted) (internal quotation marks omitted)), *superseded on other grounds by statute as stated in Benda v. Roman Catholic Bishop of Salt Lake City*, 2016 UT 37, 384 P.3d 207; *see also A.C. Fin., Inc. v. Salt Lake Cty.*, 948 P.2d 771, 775 (Utah 1997) (affirming *Hackford* factors considered in overruling precedent concerning statutory interpretation); *Dep't of Human Servs. v. Jacoby*, 1999 UT App 52, ¶ 19, 975 P.2d 939 (noting that in interpreting a statute, "we consider not only the legislative intent but also the gloss judicial precedent attaches to the statute" (citing *Hackford*, 740 P.2d at 1283)); *accord Perry v. State*, 741 A.2d 1162, 1195 (Md. 1999) ("[C]onsiderations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change the court's interpretation of its legislation . . . ." (citation omitted) (internal quotation marks omitted)); *Conway v. Town of Wilton*, 680 A.2d 242, 254 (Conn. 1996) ("Our decision that we should not overrule precedent unless cogent reason and inescapable logic require it has particular force when the precedent involved concerns the interpretation or construction of a statute.").

(cont.)

To be clear, "an argument that we got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent. Or otherwise said, it is not alone sufficient that we would decide a case differently now than we did then." *Id.*

¶28 In evaluating the weight that we should afford our precedents, we look primarily to two factors. First, we examine "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Eldridge*, 2015 UT 21, ¶ 22. In the context of statutory interpretation, "this means we consider whether the prior interpretation is '[]reasonable given the statutory framework in existence at that time.'" *State v. Robertson*, 2017 UT 27, ¶ 31, 438 P.3d 491 (alteration in original) (quoting *A.C. Fin., Inc. v. Salt Lake Cty.*, 948 P.2d 771, 775 (Utah 1997)). Second, we determine "how firmly the precedent has become established in the law since it was handed down." *Eldridge*, 2015 UT 21, ¶ 22; *see also Robertson*, 2017 UT 27, ¶ 34 ("The second factor we consider in deciding whether to overrule a prior interpretation of a statute is 'the degree to which that interpretation has worked itself into the state of the

---

What some scholars have termed the "super *stare decisis*" owed to statutory precedents promotes a close and fruitful dialogue between the legislature and the courts. William N. Eskridge, Jr., *Overruling Statutory Precedents*, 76 Geo. L.J. 1361, 1362 (1988) ("Statutory precedents . . . often enjoy a super-strong presumption of correctness."). We have often encouraged such dialogue as a means of enhancing the effectiveness, legitimacy, and wisdom of our government. *See, e.g.*, *Living Rivers v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2017 UT 64, ¶ 31 n.1, 417 P.3d 57 ("We would welcome clarification from the legislature . . . ."); *Jones v. Barlow*, 2007 UT 20, ¶ 61 n.4, 154 P.3d 808 ("[T]his court engages in a dialogue with the legislature . . . ."). The legislature can preempt a field in which the judiciary has interpreted ambiguous language by enacting statutes that run contrary to our holdings. When the legislature instead re-enacts a statute without altering the ambiguous provisions, this conversation between the legislative and judicial branches is strong evidence that the legislature agrees with the court's interpretation.

While the extent to which this doctrine exists in our law may be somewhat of an open question, we note its general existence and the force of the logic behind its application.

law.'" (quoting *A.C. Fin. Inc. v. Salt Lake Cty.*, 948 P.2d 771, 775 (Utah 1997))). In evaluating how firmly precedent has become established in the law, we look to a variety of factors including the age of the precedent, the public reliance on the precedent, the workability of the precedent, and the consistency of the precedent with other principles of law. *See Eldridge*, 2015 UT 21, ¶¶ 34–40; *see also Robertson*, 2017 UT 27, ¶¶ 34–38 (noting that we inquire whether "more good than harm will come by departing from precedent" and that this inquiry is informed by policy arguments and "practical factors" (citations omitted) (internal quotation marks omitted)). "Ultimately, we are concerned with whether overruling our precedent would upend broad swaths of the legal landscape." *Robertson*, 2017 UT 27, ¶ 34. We therefore hold Talisker to a heavy burden in this case.

### B. Stare Decisis *Applied to* Clover

¶29 In *Clover*, this court unanimously rejected the notion that the Act categorically bars recovery for injury caused by risks enumerated in the Act's exemplary list. 808 P.2d at 1047. Instead, *Clover* held that there is a secondary inquiry required to determine whether the injury-causing enumerated risk is truly an inherent risk—and therefore a risk for which the skier cannot bring a claim—under the Act. *Id.* at 1044–45. To implement this holding, *Clover* identified two categories of risks that it considered to be inherent risks within the meaning of the Act: (1) "risks . . . which skiers wish to confront as an essential characteristic of skiing" and (2) "hazards which no one wishes to confront but cannot be alleviated by the use of reasonable care on the part of a ski resort." *Id.* at 1047. In other words, courts must undertake a secondary inquiry—a "case-by-case" analysis informed by the two categories of inherent risks—to determine if the injury-causing risk is properly understood as an inherent risk of skiing within the meaning of the Act. *Id.* at 1045.

¶30 While perhaps the implementation of this holding could have been more clearly articulated, the essential holding of *Clover*—that a secondary inquiry is required to determine whether risks enumerated in the Act constitute inherent risks of skiing as the legislature intended inherent risks to be understood—commands deference under *stare decisis* given the persuasiveness of its reasoning and the extent to which it has firmly established itself in the law. Based on the required *stare decisis* analysis, we conclude

that Talisker has been unable to meet the heavy burden necessary for us to overturn *Clover*. We now address each element of our *stare decisis* test.

1. Persuasiveness

¶31 We find that the *Clover* court's construction of the Act is persuasive. The *Clover* court correctly apprehended that the legislature intended the exemplary risks to be understood in the context of the Act as a whole and against the backdrop of the sport of skiing, affording them a common sense meaning. Understood in this way, the exemplary risks present textbook examples of the inherent risks of skiing and are never "subject to elimination," as the dissent laments. *Infra* ¶ 114.

¶32 First, *Clover*'s construction ensured that the modifier "integral part" was given effect while also avoiding the pitfall of turning the list of enumerated risks into a nullity. Second, its interpretation avoided a parade of absurd consequences and comported with the codified purpose of the Act.[10] Finally, *Clover*'s interpretation respected the canon of constitutional avoidance. *Clover* recognized that, unless the Act was construed to allow suits arising from the negligence of ski area operators—*i.e.*, from any risks that were not integral to the sport—the statute would effectively abolish the negligence cause of action against ski area operators. And this, in turn, could violate the Open Courts Clause of the Utah Constitution, which would require the court to strike down the Act.

*a.* Clover's *Statutory Construction Analysis*

¶33 The *Clover* court began its statutory analysis with a plain language puzzle posed by the Act. On the one hand, the statute includes a non-exhaustive exemplary list of "inherent risks of skiing." *Clover*, 808 P.2d at 1044–45. But, on the other hand, the statute defines the "inherent risks of skiing" as those "dangers or conditions which are an integral part of the sport of skiing." *Id.* at 1044 (citation omitted).

---

[10] *Clover* understood that the purpose of the statute was "to clarify the law, not to radically alter ski resort liability." 808 P.2d at 1045 (internal quotation marks omitted).

¶34 The interpretive puzzle, then, is what to do with the ambiguity generated when one of the listed risks manifests itself in such a way that it plainly is not "an integral part of the sport of skiing." Talisker suggests that "integral part of the sport of skiing" is merely a synonym for "inherent." In Talisker's view, if a risk appears in the exemplary list, then the legislature has already determined that the risk is an integral part of the sport of skiing.[11] But this interpretation disrespects the structure of the statute. By Talisker's reasoning, the phrase "integral part of the sport of skiing" does no work; the statute could just as easily state that ski area operators are shielded from liability for any of the "inherent risks of skiing, including, but not limited to," the enumerated list of risks. In other words, the definition of "inherent risks of skiing" that Talisker prefers under the Act is the same as if the legislature had entirely omitted the phrase "integral part of the sport of skiing." This flouts the canon against surplusage. *See Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600 ("Wherever possible, we give effect to every word of a statute, avoiding '[a]ny interpretation which renders parts or words in a statute inoperative or superfluous.'" (alteration in original) (citation omitted)).

¶35 The *Clover* court concluded that the best way to give effect to all terms in the statute was to hold that "the dangers listed in [the definition of 'inherent risks of skiing'] are modified by the term 'integral part of the sport of skiing.'" 808 P.2d at 1044. And "[t]herefore, ski area operators are protected from suits to recover for injuries caused by one or more of the [enumerated risks] only to the extent that those [risks], under the facts of each case, are integral aspects of the sport of skiing." *Id. Clover* explained that this interpretation pays respect to the "ordinary and accepted meaning of the term 'inherent'" as used by the legislature by limiting

---

[11] We note that this argument, which Talisker raises in its supplemental briefing, differs in some respects from the arguments that Talisker presented at oral argument, when Talisker at times seemed to suggest that inclusion on the exemplary list may not be dispositive. In the interest of readability, and because any differences in Talisker's arguments over time do not affect our ultimate conclusion, this opinion does not differentiate between the different arguments made by Talisker at different stages of this litigation.

inherent risks to "risks that are so integrally related to skiing that the sport cannot be undertaken without confronting these risks." *Id.* at 1047. In the *Clover* court's estimation, then, the legislature intended the enumerated risks to constitute inherent risks—and therefore bar recovery for injuries resulting therefrom—only when those risks are encountered in such a way that the risk is an integral part of the sport of skiing. We believe that this is a completely reasonable interpretation of the Act.

¶36 The dissent argues that the list in section 402 is "rendered superfluous if enumerated risks are still subject to elimination if they are not deemed 'integral' to skiing." *Infra* ¶ 114. We disagree. The list still provides independent value even when subjected to the secondary inquiry under *Clover*.

¶37 The list is not rendered superfluous because section 404 requires ski area operators to post warning signs that list the inherent risks of skiing set forth in section 402. UTAH CODE § 78B-4-404. In this sense the list provides important, independent value in the context of the statute because it is directly related to the discharge of a ski area operator's duties under the Act. *See infra* ¶ 52 (explaining that ski area operators discharge their duty of reasonable care by posting signage that lists the enumerated inherent risks of skiing).[12]

---

[12] The dissent argues that "the warning sign as imagined by the majority is pointless" and "a ski resort would have no reason to list [the enumerated] risks on a posted sign" if one accepts *Clover* and our majority opinion here. *Infra* ¶ 114 n.35. But as we have explained, this is simply not true. The legislature has explicitly required ski resorts to post warning signs that list the enumerated risks and explains the limitations on liability of ski area operators. UTAH CODE § 78B-4-404. This alone is reason enough for ski area operators to post these warning signs. Additionally, the legislature could have had any number of reasons for requiring the warning signs, even if the enumerated risks are subject to a secondary inquiry under *Clover*. Perhaps the legislature wanted to provide notice to patrons that ski resorts operate in a unique world of liability. Or perhaps the legislature wanted to inform first-time skiers—such as tourists who may be unfamiliar with the sport—of the types of risks they could expect to encounter while skiing. In

(cont.)

¶38 Additionally, the list helps inform our understanding of what kind of non-enumerated risks are inherent risks of skiing through the canon of *ejusdem generis*. "In its simplest terms, *ejusdem generis* posits that general catchall terms appearing at the beginning or end of an exemplary statutory list are understood to be informed by the content of the terms of the list." *GeoMetWatch Corp. v. Utah State Univ. Research Found.*, 2018 UT 50, ¶ 26, 428 P.3d 1064 (citation omitted) (internal quotation marks omitted). "*Ejusdem generis* presumes that in order to give meaning to a general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated . . . ." *Id.* (citation omitted) (internal quotation marks omitted). The Act uses the general catchall term of "dangers or conditions which are an integral part of the sport of . . . skiing." UTAH CODE § 78B-4-402(1). If we were tasked with determining whether a danger or condition not covered by the exemplary list was an inherent risk of skiing, we would ask how the specifically enumerated risks can inform our understanding of the general "dangers or conditions which are an integral part of the sport of . . . skiing." One way in which the specifically enumerated risks would inform our understanding is to consider the character and nature of those risks. Here, the specifically enumerated risks are presented in the "character" or "nature" in which a skier would reasonably expect to encounter them while skiing. Instead of listing, say, "faulty lift towers" or "improperly constructed terrain parks," the Act simply lists "lift towers" and "terrain parks." Therefore, we would only consider a non-enumerated danger or condition to constitute an inherent risk if that danger or condition was of the same character or nature as the enumerated risks—that is, if the danger or condition was one that a skier would reasonably expect to encounter while skiing.[13]

---

any event, the list of enumerated risks is not rendered superfluous by *Clover* because the enumerated risks are still important to fulfilling a ski area operator's duty under section 404.

[13] The dissent mischaracterizes this discussion as standing for the proposition that "we can ignore the straightforward application of a list because *its sole function* might be to inform the meaning of the catchall." *Infra* ¶ 113 n.34 (emphasis added). As we have just discussed above, the list serves the independent purpose of giving

(cont.)

¶39 And *Clover*'s interpretation also makes sense in practice. As *Clover* succinctly puts it, refusing to modify the list of risks by reference to the phrase "integral part of the sport of skiing" would "result in a wide range of absurd consequences." 808 P.2d at 1044–45. Under Talisker's proposed interpretation of section 402, a collision with a lift tower that the ski resort has intentionally camouflaged as to be practically invisible to skiers is an "inherent risk of skiing" because "impact with lift towers" is an enumerated risk. That cannot be right; such an interpretation defies our understanding of the "ordinary and accepted meaning of the term 'inherent'" as used by the legislature in the Act. *Id.* at 1047. But such results are inevitable under Talisker's interpretation.

¶40 Indeed, the universe of potential absurd scenarios is nearly limitless. For example, the Act includes "rocks" in the definition of inherent risks. UTAH CODE § 78B-4-402(1)(c). Given the location of ski resorts on mountains, skiers reasonably expect to encounter rocks while skiing. And if a skier's injury was caused by a rock in the state or condition in which a skier would expect to encounter a rock while skiing, then the Act would undoubtedly bar recovery for that injury. But what skiers would not reasonably expect to encounter—and what the Act could not reasonably bar recovery for—are, for example, rocks gathered in a pile in the middle of a blind spot on a beginner ski run waiting to be placed for landscaping.

¶41 Fortunately, it is a common sense and long-standing canon of construction in Utah that, as between competing interpretations of an ambiguity in a statute, the one that avoids such nonsensical outcomes is generally preferred. *See Anderson v. Utah Cty.*, 368 P.2d 912, 913 n.3 (Utah 1962) ("[I]t is a general rule that where a statute is ambiguous in terms and fairly susceptible of two constructions,

---

content to section 404's requirement that ski area operators post warning signs. *See supra* ¶ 37, n.12. Our discussion of *ejusdem generis* exists here only to demonstrate an additional, ancillary function of the list. In no way, shape, or form do we suggest that application in a hypothetical *ejusdem* analysis is "the sole function" of the list. Nor do we use *ejusdem* to interpret or "overrid[e]" the enumerated risks, as the dissent suggests. *Infra* ¶ 113 n.34. Instead, we have simply posited how the list would help inform an *ejusdem* analysis of a non-enumerated risk.

the unreasonableness or absurdity which may follow one construction or the other may properly be considered. Unreasonable, absurd, or ridiculous consequences should be avoided." (citation omitted) (internal quotation marks omitted)); *see also Bagley v. Bagley*, 2016 UT 48, ¶ 27, 387 P.3d 1000 ("[T]he absurd consequences canon . . . merely resolve[s] an ambiguity by choosing the reading that avoids absurd results." (third alteration in original) (citation omitted) (internal quotation marks omitted)); *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 46, 357 P.3d 992 (Durrant, C.J., writing for the majority on this issue) ("Our caselaw recognizes two different interpretive tools concerning absurdity. We have referred to the first as the absurd consequences canon and to the second as the absurdity doctrine. We apply the absurd consequences canon to resolve ambiguities in a statute.").[14]

¶42 The dissent takes what it seems to view as a different tack than Talisker, arguing that listed risks are only inherent risks to the extent that the injury-causing risk "falls within the ordinary meaning of the terms of the statute." *Infra* ¶ 186 n.50. But it is unclear exactly what the dissent means when it says it would conduct an ordinary meaning analysis.

¶43 For example, the pile of rocks intended for later landscaping placed in the middle of a beginner run is not a risk that a skier would expect to encounter when skiing. And it seems that the pile of rocks is certainly a "surface . . . condition[] such as . . . rocks" within the ordinary meaning of the term. UTAH CODE § 78B-4-402(1)(c). After all, it is a pile of rocks on the surface of a ski run.[15]

---

[14] The dissent accuses us of "distort[ing] the absurdity doctrine." *Infra* ¶ 133. This criticism entirely misses the point. We do not contend that the absurdity doctrine applies here. Because we conclude—contra to the dissent—that section 402 is ambiguous, "the question is not one of overriding text that is unmistakably clear" and therefore "we view this as a case for the absurd consequences canon, not the absurdity doctrine." *Utley*, 2015 UT 75, ¶ 39 n.14 (Lee, A.C.J., concurring in the judgment on this issue).

[15] It is easy to think of similar hypotheticals. For example, a twenty-yard bare spot running through the middle of a groomed ski run is not a risk that a skier would expect to encounter. But it is

(cont.)

The dissent should—but fails to—own that its interpretation inexorably leads to this absurd consequence and responds that, "at least arguably," this pile of rocks would not "qualify as a 'natural' 'surface or subsurface condition.'" *Infra* ¶ 131. But it is entirely unclear why this would be the case—and the dissent's qualification of its conclusion with "at least arguably" suggests that it does not know either.[16]

### b. *Purpose of the Act*

¶44 This court's analysis in *Clover* was based largely on "[t]he express purpose of the statute, codified in section [78B-4-401], [which] is 'to clarify the law in relation to skiing injuries and the risk[s] inherent in the sport.'" 808 P.2d at 1045. To clarify means to "make . . . easier to understand." *Clarify*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005). As we stated in *Clover*, the legislature's purpose in clarifying the law does not suggest an intent to "radically alter ski resort liability," rather it shows an intent to make the law of ski resort liability as it existed in 1979—when the legislature passed the Act—easier to understand. 808 P.2d at 1045. To determine the persuasiveness of *Clover*'s holding, we must look at the law as it existed in 1979 when the Act came into effect.

¶45 To better understand the confluence of events that culminated in the Act's passage in 1979, it is helpful to have a basic understanding of the doctrine of assumption of risk. There are three distinct branches of assumption of risk: (1) primary express,

---

inescapable that the bare spot would be considered a "bare spot[]" under the dissent's analysis.

[16] Although the dissent bemoans what it views as a lack of predictability with the *Clover* test, it is unclear that the dissent's own proposed analysis lends itself to predictability. The dissent repeatedly resorts to qualifiers such as "*could* reasonably be dismissed as," "[t]he same *may* hold," and "at least *arguably*" when using its ordinary meaning analysis to engage our hypotheticals. *Infra* ¶ 131 (emphases added). If the dissent is actually unable to determine whether these hypotheticals qualify as inherent risks under its analysis then it should so indicate. Likewise, if the dissent thinks that the risks in the hypotheticals, such as the pile of rocks or the twenty-yard bare spot, actually *would* qualify as inherent risks under its analysis, it should own up to that fact.

(2) primary implied, and (3) secondary. *Moore v. Burton Lumber & Hardware Co.*, 631 P.2d 865, 869–70 (Utah 1981). Primary express assumption of risk "involves a contract[] . . . in which a party expressly contracts not to sue for injury . . . which may thereafter be occasioned by the acts of another." *Jacobsen Constr. Co. v. Structo-Lite Eng'g, Inc.*, 619 P.2d 306, 310 (Utah 1980). As we have held the preinjury liability release in this case to be unenforceable, *see supra* ¶¶ 18–23, this branch is not at issue here.

¶46 Primary implied, more often called primary assumption of risk, "involves a relationship in which [the] defendant simply owes no duty of care to the plaintiff." *Moore*, 631 P.2d at 870. Because no duty is owed, there can be no negligence. This branch of assumption of risk applies when a person is "injured as a consequence of being exposed to a risk which the [defendant] in the exercise of due care could not avoid." *Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 71 (1943) (Frankfurter, J., concurring); *see also* Wendy A. Faber, Comment, *Utah's Inherent Risks of Skiing Act: Avalanche from Capitol Hill*, 1980 UTAH L. REV. 355, 358 ("Primary assumption of risk involves no fault because it refers to dangers that are 'inherent' in a given activity—dangers that cannot be alleviated by reasonable care.") [hereinafter Faber, *Utah's Inherent Risks of Skiing Act*]; Kent Feuerhelm et al., *From* Wright *to* Sunday *and Beyond: Is the Law Keeping Up With the Skiers?*, 1985 UTAH L. REV. 885, 886 ("Primary assumption of risk bars a plaintiff from recovering for injuries caused by dangers inherent in the activity. Because the dangers are inherent, the theory assumes that no reasonable amount of care can alleviate the risk, thus no fault is involved."). Primary assumption of risk is perhaps best understood to negate the further existence of any duty on the behalf of the defendant once the defendant has discharged its initial duty of reasonable care. That is, once a ski area operator has taken reasonable care to protect its patrons, it cannot be held liable for any injuries resulting from those inherent risks that persist despite the exercise of reasonable care.

¶47 Secondary assumption of risk applies when a person "unreasonabl[y] encounter[s] . . . a known and appreciated risk." *Moore*, 631 P.2d at 870. This branch is treated, for all intents and purposes, as a "phase of contributory negligence." *Jacobsen Constr.*, 619 P.2d at 310. Whereas the primary assumption of risk doctrine provides that there is no duty, thereby barring a claim for negligence, secondary assumption of risk is an affirmative defense

to a substantiated claim of negligence. *Id.* Under this branch, if a plaintiff proves that the defendant is negligent, the defendant may still avoid liability by establishing secondary assumption of risk. In fact, prior to 1973, secondary assumption of risk served as a "complete bar to recovery" for plaintiffs. *Id.* at 309.

¶48 In 1973, the Utah Legislature adopted the Utah Comparative Negligence Act, 1973 Utah Laws 710–11, "to avoid the harshness visited upon plaintiffs as a result of the all-or-nothing nature of the former rule of law," *Jacobsen Constr.*, 619 P.2d at 309. Specifically, the Comparative Negligence Act stated that "[c]ontributory negligence shall not bar recovery in an action . . . to recover damages for negligence . . . if such negligence was not as great as the negligence . . . of the person against whom recovery is sought." 1973 Utah Laws 710–11. Additionally, the Comparative Negligence Act provided that, for purposes of the act, "'contributory negligence' includes 'assumption of risk.'" *Id.* at 711. Assumption of risk as used in this context represented the secondary form of assumption of risk. *Moore*, 631 P.2d at 870; *see also Jacobsen Constr.*, 619 P.2d at 312 ("We thus hold that under our comparative negligence statute 'assumption of the risk' . . . is to be treated . . . in its secondary sense . . . .").[17]

¶49 Additionally, by 1979, there was broad national consensus that the common law defense of assumption of risk was being eroded by case law, especially with respect to ski area operators. *See Sunday v. Stratton Corp.*, 390 A.2d 398, 401–03 (Vt. 1978) (holding that a snow-covered bush is not an assumed risk of skiing); Michael J. Farrow, Comment, *Ski Operators and Skiers—Responsibility and*

---

[17] Although the Comparative Negligence Act used the blanket term "assumption of risk," a closer examination of primary and secondary assumption of risks confirms that, as used in this context, only the secondary assumption of risk is in play. This follows because the primary assumption of risk reflects the notion that no duty was owed to the plaintiff. In those cases, there could be no comparative negligence as between plaintiff and defendant because defendant could never be negligent as a matter of law. *See Hale v. Beckstead*, 2005 UT 24, ¶ 24, 116 P.3d 263 ("Where there is no duty, there is no fault to compare or distribute under the comparative fault scheme.").

*Liability*, 14 New Eng. L. Rev. 260, 268–70 (1978–79) (discussing the ski industry's reaction to the *Sunday* decision). Thus, when the legislature passed the Act to "clarify the law," by providing that skiers "assume[] the risks inherent in the sport of skiing," it seems clear that the legislature intended to restore and maintain the law of ski resort liability as it existed prior to the perceived erosion of the defense of assumption of risk. Utah Code § 78B-4-401. This is supported by the fact that the confusion in the law that the legislature intended to clarify was only the "confusion as to whether a skier *assumes the risks* inherent in the sport of skiing." *Id.* (emphasis added).

¶50 In *Clover*, we cited *Wright v. Mt. Mansfield Lift, Inc.*, 96 F. Supp. 786 (D. Vt. 1951), for the proposition that "when the [Act] was enacted the majority of jurisdictions employed the doctrine of primary assumption of risk" to ski area operator liability. 808 P.2d at 1045; *see also* Faber, *Utah's Inherent Risks of Skiing Act* at 359 ("[P]rimary assumption of the risk . . . traditionally governed ski injury litigation."). Relying on the doctrine of primary assumption of risk, we concluded that the legislature was attempting to define and clarify the duty of ski area operators under this existing doctrine. *Clover*, 808 P.2d at 1045–46. This appears to be correct.

¶51 Talisker argues that the legislature actually intended to redefine the duty of ski area operators in the Act, and that ski area operators therefore owe no duty to skiers for any of the risks listed in section 402 as "inherent risks of skiing." However, such an interpretation would amount to a radical alteration of tort law, which is something the legislature did not intend. Rather, as we noted in *Clover*, the legislature's purpose according to section 401 was to clarify that ski area operators may still raise a defense of primary assumption of risk against a skier's claim for liability.[18]

---

[18] While the Act appears to have conflated the two forms of assumption of risk when it announced that "[n]otwithstanding anything in [the Comparative Negligence Act] to the contrary, no skier shall make any claim against . . . any ski operator for injury resulting from any of the inherent risks of skiing," 1979 Utah Laws 909, this is understandable given the Comparative Negligence Act's ambiguous use of the term "assumption of risk," *see supra* ¶ 49 n.17. This confusion is even more understandable given that the Act was passed before we issued our decisions in *Jacobsen*

(cont.)

Under this doctrine, ski area operators owe a duty to exercise reasonable care, but a skier assumes the inherent risks of skiing to the extent that those risks persist after the ski area operator's exercise of reasonable care. *See Wright*, 96 F. Supp. at 790–91; *see also supra* ¶ 46.

¶52 The legal principle that the legislature was trying to reassert, then, is that ski area operators have the duty to exercise reasonable care with respect to the inherent risks of skiing, but skiers assume those risks to the extent those risks persist after a ski area operator's exercise of reasonable care. And in doing so, the legislature provided the standard of reasonable care required of ski area operators with respect to the inherent risks of skiing. Specifically, section 78B-4-404 provides that "[s]ki area operators shall post trail boards at one or more prominent locations within each ski area which shall include a list of the inherent risks of skiing . . . as defined in [the Act]." Therefore, once a ski area operator posts trail boards warning skiers of the inherent risks of skiing, it has discharged its duty of reasonable care—and therefore owes no further duty—with respect to the inherent risks of skiing, and skiers assume the risk of any injury caused by those risks to the extent that they are inherent risks within the meaning of the Act.[19] This understanding of the Act comports with the self-described purpose of the Act to "clarify the law" by providing ski area operators with a means to assert the defense of primary assumption of risk while also maintaining a cause of action for skiers injured by

---

*Construction* and *Moore*, which delineated between the different forms of assumption of risk and declared the Comparative Negligence Act to apply only as to secondary assumption of risk. *See supra* ¶ 48.

[19] This does not mean that ski area operators are automatically absolved from liability for injuries caused by risks listed on the trail boards they post. Instead, the Act still requires a case-by-case analysis to determine whether the injury-causing risk is truly an inherent risk of skiing. If the injury-causing risk is determined to not be an inherent risk of skiing, then the case falls outside the purview of the Act and the ski area operator's compliance with section 404 becomes immaterial with respect to defining the ski area operator's duty.

risks that they do not assume, such as those risks created by ski area operator negligence.

¶53  This interpretation is further bolstered by the fact that the word "negligence" is mentioned nowhere in the Act. Unlike the dissent, we find it nigh impossible to believe that the legislature intended to completely abolish the negligence cause of action with respect to enumerated risks when the Act itself says nothing about negligence. It is one thing to say that the legislature could have spoken more clearly, it is entirely another to apply that concept when the act in question neglects to mention its alleged core purpose. Legislatures, after all, "do[] not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). And abolishing negligence claims is one heck of a big elephant.[20]

¶54  Based on this discussion of the purpose of the Act, we hold that the core holding of *Clover* continues to be persuasive in that the Act does not demonstrate a legislative intent to categorically bar recovery for injuries caused by risks enumerated in section 402. Rather, the Act intended to reassert the availability of the defense of primary assumption of risk for ski area operators—even in cases involving one of the enumerated risks.

### c. Constitutional Avoidance

¶55  The *Clover* court also recognized that construing the Act to bar claims arising from the negligence of ski area operators (*i.e.*,

---

[20] The dissent argues that "there is nothing elephant-ish about the establishment of a bar on a negligence claim for injuries arising from inherent risks of skiing." *Infra* ¶ 126. We disagree. Such a reading would directly contradict the doctrine of primary assumption of risk because primary assumption of the risk still presupposes a baseline exercise of reasonable care. If the Act barred all claims for listed risks—even those risks that could have been eliminated through the exercise of reasonable care such as the pile of rocks or the twenty-yard bare spot—then the Act would not be embracing the doctrine of primary assumption of risk. And this would have represented a major departure from the status quo. Furthermore, such a scheme would also raise some serious constitutional questions, which we address below. *See infra* ¶¶ 55–58.

from risks that were not integral to the sport) could violate the Open Courts Clause of the Utah Constitution. *See* 808 P.2d at 1044 n.38 ("Because we interpret [the Act] as not prohibiting legitimate negligence claims, we do not reach Clover's argument that the statute violates . . . [the Open Courts Clause] of the Utah Constitution . . . .").

¶56 The Open Courts Clause "declares that an individual shall have a right to a 'remedy by due course of law' for injury to 'person, property, or reputation.'" *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 674 (Utah 1985) (quoting UTAH CONST. art. 1, § 11). We have acknowledged that we have "an obligation of deference to legislative judgments in a *Berry* review." *Judd v. Drezga*, 2004 UT 91, ¶ 11, 103 P.3d 135. And while the Open Courts Clause does not prohibit the legislature from "creat[ing]," "defin[ing]," and "moderniz[ing]" the law, it nonetheless "acts as a substantive check on legislative power." *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 18, 416 P.3d 635 (citation omitted) (internal quotation marks omitted). In *Berry*, this court announced a three-part test to determine whether legislation violates the Open Courts Clause.

¶57 First, we look to see "whether the legislature has abrogated a cause of action." *Waite*, 2017 UT 86, ¶ 19. If the legislature has abrogated a cause of action, "we then determine whether 'the law provides an injured person an effective and reasonable alternative remedy.'" *Id.* (quoting *Berry*, 717 P.2d at 680). And finally, if there is no alternative remedy, we look to see "if there is a clear social or economic evil to be eliminated and [if] the elimination of an existing legal remedy is not an arbitrary or unreasonable means for [eliminating such evil]." *Id.* (quoting *Berry*, 717 P.2d at 680) (internal quotation marks omitted). If no "clear social or economic evil" is being eliminated, then the legislative act runs afoul of the Open Courts Clause.

¶58 It is easy to see why the *Clover* court considered constitutional avoidance in reaching its decision. If the Act was interpreted to prohibit all negligence claims arising from injuries caused by one of the Act's enumerated risks, then it is possible that the Act could pose a serious Open Courts issue. In reading the ambiguity in the statute to mean that every claim requires a

case-by-case analysis, the *Clover* court avoided deciding this thorny constitutional question.[21] And because Talisker has not carried its burden in persuading us that *Clover* was not well reasoned, we need not rule on this issue either.

### d. Treatment of Clover *in Other Jurisdictions*

¶59 Other jurisdictions have also found *Clover* persuasive in analyzing their own inherent risk statutes. For example, *Kopeikin v. Moonlight Basin Management, LLC* found *Clover* and its successor, *White v. Deseelhorst*, 879 P.2d 1371 (Utah 1994), "particularly helpful" in analyzing whether Montana's statutory scheme—which was "similar" to Utah's—allowed a suit for negligent design or maintenance of a cat track. 981 F. Supp. 2d 936, 939, 943 (D. Mont. 2013). After summarizing the core holding of *Clover*, *Kopeikin* drew on *Clover* to conclude that "[Montana's Inherent Risks of Skiing Act] should be read in a manner that avoids constitutional violations and gives meaning to all of its provisions," and that doing so would help avoid "absurd results." *Id.* at 945–46. Specifically, *Kopeikin* held that "Montana's statutory definition of 'inherent dangers and risks of skiing' must be read in conjunction with the ski area operator's statutory duty of reasonable care" because "[a] mechanical application of the statute focused solely on the object with which the plaintiff collided would produce results

---

[21] The dissent argues that "'[m]ere doubts about the constitutionality' of the statute 'are not enough to override the legislature's intent'" when the statute "lends itself to only one reasonable interpretation." *Infra* ¶ 137. While we may take no issue with this assertion, we take issue with the premise that there is "only one reasonable interpretation" of the Act. Because there is not only one reasonable interpretation of the Act, *see supra* ¶¶ 33–43, our acknowledgment of an Open Courts concern here is entirely appropriate.

Furthermore, the Open Courts issue here is not a "vague constitutional question," as the dissent suggests. *Infra* ¶ 136. It presents a discrete and cognizable constitutional question: Would a prohibition on all suits involving injuries caused by risks enumerated in the Act violate the Open Courts Clause of the Utah Constitution? The existence of an exact constitutional question only bolsters the appropriateness of considering the Open Courts issue in our *stare decisis* analysis.

that are 'entirely arbitrary' . . . ." *Id.* at 945 (quoting *Clover*, 808 P.2d at 1045). In this sense, *Kopeikin* fully endorses *Clover's* holding that a secondary inquiry is required to determine whether a listed risk is truly an inherent risk, even in the face of a statute that simply provided "'[i]nherent dangers and risks of skiing' means those dangers or conditions that are part of the sport of skiing, including: [listed risks]." *Id.* at 939 (citing Mont. Code Ann. § 23-2-702(2)).

¶60 Additionally, the New Hampshire Supreme Court relied on *Clover* in upholding New Hampshire's Inherent Risks of Skiing statute against a challenge alleging that it violated a provision of the New Hampshire Constitution that guarantees all litigants a remedy. *Nutbrown v. Mount Cranmore, Inc.*, 671 A.2d 548, 550–52 (N.H. 1996). In so doing, it found *Clover*'s parallel analysis of Utah's Inherent Risks of Skiing Act persuasive—concluding that the New Hampshire statute "embodie[d] the doctrine of primary assumption of risk" and limited recovery only for injuries caused by "dangers inherent in the sport" of skiing. *Id.* at 551.[22]

2. Firmly Established

¶61 The question then turns to whether *Clover* is "firmly established" in Utah law—including the extent to which it has

---

[22] The dissent contends that *Nutbrown* does not "endorse[] the framework of the *Clover* decision." *Infra* ¶ 160. Instead, because the New Hampshire code also contained a separate statute that contained specific duties with which a ski resort is charged, the dissent believes that "*Nutbrown* cites *Clover* only for the proposition that '[t]he statute does not purport to immunize a ski area operator for injuries caused by the operator's own negligent or intentional acts'" and provides no endorsement for *Clover*. *Infra* ¶ 160 (alteration in original) (quoting *Nutbrown* 671 A.2d at 551 ). But the context of that quote is crucial. The immediately preceding sentence states, "[s]ignificantly, the limitation on recovery found in [the New Hampshire statute that defines inherent risks of skiing], applies only to injuries caused by 'dangers inherent in the sport' of skiing." *Nutbrown*, 671 A.2d at 551 (citation omitted). In this context, it is clear that *Nutbrown* is citing *Clover* for the proposition that the limitation on recovery for "dangers inherent in the sport" does not include immunization "for injuries caused by the operator's own negligent or intentional acts." *Id.*

created reliance interests and whether it has proven workable in practice. *See Eldridge*, 2015 UT 21, ¶ 22. We believe that it is.

¶62 Our conclusion is informed by a number of considerations. *Clover* is entitled to deference under *stare decisis* because the legislature is free to change its conclusion at any time by amending the Act. And in the years since *Clover* was decided, the legislature has not amended the Act to overrule the holding of *Clover*. In declining to do so, *Clover* has become firmly established in Utah law. Furthermore, under the prior construction canon, by amending and re-enacting the Act without negating *Clover's* core holding, *Clover* has been carried forward by the legislature as an authoritative interpretation of the Act. As a consequence, Talisker has not demonstrated that this history has not created a public reliance on *Clover*. And finally, Talisker has not carried its burden in convincing us that *Clover* has proven to be unworkable in practice.

### a. Legislative Treatment of Clover

¶63 *Clover* was decided in 1991 and in our 1994 opinion, *White v. Deseelhorst*, we directly invited the legislature to tell us if we incorrectly interpreted the Act in *Clover*. 879 P.2d 1371, 1377 (Utah 1994), *abrogated on other grounds by Penunuri v. Sundance Partners, LTD*, 2017 UT 54, 423 P.3d 1150, (Zimmerman, C.J., concurring) ("If the legislature disagrees with *Clover*'s construction of the inherent risks of skiing statute, it can change it, but we should leave the matter where it lies."). Despite ample opportunity and an express invitation, it has not done so.

¶64 Our legislature has had at least two opportunities to overrule the core holding of *Clover*. In 1993, and again in 2006, the legislature made changes to the definitions section of the Act—the very same section on which *Clover's* analysis turns. In 2006, for example, the definition of skiing was expanded "to include participation in, or practicing or training for, competitions or special events." *Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co.*, 2014 UT App 190, ¶ 35, 333 P.3d 1266 (quoting 2009 Utah Laws 549, 549) (internal quotation marks omitted).

¶65 As the court of appeals recognized, Senator Lyle Hillyard, the 2006 amendment's sponsor, specifically stated that the 2006 amendment was not intended "to exempt the negligence of the ski resort" from the liability *Clover* had imposed. *Id.* ¶ 35 n.13 (quoting

Recording of Utah Senate Floor Debates, 56th Leg., Gen. Sess. (Feb 13, 2006) (statement of Sen. Lyle Hillyard)). And "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982); *see also* SCALIA & GARNER, READING LAW at 322 (noting that when a phrase has been "authoritatively interpreted" by a jurisdiction's highest court, "a later version of that act perpetuating the wording [of that phrase] is presumed to carry forward that interpretation").[23]

¶66 We are loath to embrace legislative history as an interpretive tool for statutory interpretation without first exhausting other interpretive tools. But it is relevant for purposes of applying our *stare decisis* principles—principles that, in the statutory context, emphasize the legislature's ability to reverse a court's decision and the importance of crafting statutory *stare decisis* principles in such a way that we promote, when possible, interbranch dialog. The fact that the legislature has specifically taken up the Act, not once, but twice, and expressly declined to

---

[23] The dissent argues that the full text of Senator Hillyard's comments actually cuts against support for *Clover* because (1) the example of negligence Senator Hillyard supplied was not an enumerated inherent risk, and (2) he stated support for "the 'policy' that the 'state made in the 1980s,' not the common law developments since that time." *Infra* ¶¶ 169–171. But Senator Hillyard—the sponsor of the bill—was clear in his comments: "I should indicate that there's no intention in this to exempt the negligence of the ski resort." Recording of Utah Senate Floor Debates, 56th Leg., Gen. Sess. (Feb. 13, 2006) (statement of Sen. Lyle Hillyard). His subsequent example of negligence that falls outside the list of enumerated risks (which is not dispositive of whether it is an inherent risk because the list is non-exhaustive) does not undercut his statement's value. Further, neither Senator Hillyard nor any other legislator said anything to cast shade on *Clover*.

amend it so as to do away with *Clover*'s holding, is a good reason to continue to accord *Clover* weighty *stare decisis*.[24]

### b. Reliance

¶67 In light of *Clover*'s age, the legislature's choice to leave *Clover* untouched since it was decided, and the unmistakable importance of the ski industry to Utah's economy, it is easy to see how *Clover* has resulted in widespread public reliance.

¶68 For example, there can be no doubt that ski resorts have invested in infrastructure and personnel to abate potential negligence actions under *Clover*, with some resorts investing more and some less, each with an eye toward getting a competitive advantage. There can be no doubt that contracts are in place to supply, maintain, and replace this infrastructure and that some of the personnel forewent other employment opportunities in favor of working at the resort. Nor can there be any doubt that insurers and resort owners have negotiated policies and premiums against the backdrop of *Clover*. And consider the potential commercial advantage that Utah ski resorts may have obtained over other ski resorts by virtue of *Clover*'s construction of the Act—which may afford more opportunities for relief to injured skiers in Utah and hence, at the margins, more incentive to ski in the state. We respectfully suggest that it is naïve to think that *Clover* has not generated significant reliance interests in an industry as large and complicated as Utah's ski industry. And again, Talisker certainly has not met its burden of dispelling this notion.[25]

---

[24] The dissent argues that legislative inaction in this area does not "indicate legislative acquiescence. And it is sheer speculation to assume the contrary." *Infra* ¶ 165. Under different circumstances we might agree, but not here. The fact that we have expressly invited the legislature to address our holding in *Clover*, *White,* 879 P.2d at 1377, coupled with a well-heeled ski industry, the legislature revising the Act on multiple occasions, and Senator Hillyard's comments lead us to the conclusion that "legislative acquiescence" is far from "sheer speculation" in this case.

[25] The dissent argues that the reliance interests we identify here are "minimal." *Infra* ¶ 175. We disagree. Moreover, this is beside the point: even if the dissent was correct and the reliance on *Clover* we have identified in this opinion was minimal, Talisker has not

(cont.)

### c. Workability

¶69 Additionally, Talisker has not met its burden of producing evidence to suggest that *Clover* is unworkable.

¶70 For one, *Clover*'s workability is evidenced by the fact that, despite being nearly thirty years old, it has not generated substantial appellate litigation. This suggests that district courts are able to understand and apply *Clover* in ski area operator liability cases. Of course, other explanations are also possible. But it is Talisker's burden to show us that *Clover* is poorly understood. To carry this burden of persuasion, Talisker must adduce evidence of confusion and lack of reliance among litigants and in the lower courts. It has not done so.

¶71 Importantly, the ski industry appears to have done nothing to "correct" *Clover* in the legislature. Indeed, when asked at oral argument, both Talisker and amicus Ski Utah stated that they were unaware of any efforts made to lobby the legislature to alter *Clover*'s core holding. Certainly, if the standard were as unworkable as Talisker and amici suggest, Utah's ski industry would have, at some point in the last twenty-eight years, introduced some evidence in the record demonstrating the industry's confusion and consternation. It did not.

¶72 Furthermore, other jurisdictions have drawn on *Clover*'s analysis in evaluating their own liability statutes. For example, the Supreme Court of North Dakota has adopted *Clover*'s core holding. North Dakota's version of the Act provided that "[e]ach skier expressly assumes the risk . . . for any injury . . . caused by the following: variations in terrain; surface or subsurface snow or ice conditions; bare spots, rocks, trees, or other forms of forest growth or debris." *Bouchard v. Johnson*, 555 N.W.2d 81, 83 (N.D. 1996) (citation omitted) (internal quotation marks omitted). In declining to interpret the statute to "act as a complete bar to any recovery," the court stated that "the better view is contained in the Utah Supreme Court's decision in *Clover*." *Id.* at 83–84. It accordingly held that "[t]here should be no liability for a ski area operator if the design of the ski run creates natural conditions, necessary to the

---

made this argument or, for that matter, demonstrated any lack of reliance. And because Talisker is the party asking us to overturn *Clover*, the burden of persuasion is Talisker's to bear.

enjoyment of the sport." *Id.* at 85. But "[c]onversely, if the design problem was created by the operator's negligence and was not an inherent risk associated with the sport, liability for the operator should exist." *Id.*

¶73 The dissent claims that "[t]he 'proper standard' endorsed by *Bouchard* is not the *Clover* framework." *Infra* ¶ 156. It asserts that *Bouchard* is different because the North Dakota statute "begins with an extensive list of 'duties' that '[e]very ski operator shall have" and then notes that because skiing is hazardous despite all feasible safety measures, "'[e]ach skier expressly assumes the risk of' injuries resulting from enumerated inherent risks of skiing." *Infra* ¶ 157 (alterations in original) (quoting *Bouchard*, 555 N.W.2d at 83 ). But *Bouchard* does exactly what *Clover* does: it interprets the statutorily enumerated inherent risks of skiing—those that a skier assumes and cannot be a basis for legal recovery—to only include those risks when they "do[] not present a danger beyond what might be anticipated for the skier who assumes the risk inherent in skiing." *Bouchard*, 555 N.W.2d at 85. Right after setting out the standard that the dissent claims is "not the *Clover* framework," the *Bouchard* court goes on to give an example that squarely fits within *Clover*:

> [I]f a tree exists as part of the ski run design and does not present a danger beyond what might be anticipated for the skier who assumes the risk inherent in skiing, there should be no liability for injuries caused by the tree. The risk of a collision with a tree of this nature is an inherent risk. However, *notwithstanding the express reference to trees* in [the North Dakota statute], if a tree or tree stump creates a risk which cannot be said to be inherent in the sport design, the operator should be liable for any injuries caused by this danger.

*Bouchard*, 555 N.W.2d at 85–86 (emphasis added). It is clear that the North Dakota Supreme Court found no issues with the implementation of a secondary inquiry—one very similar to the secondary inquiry in *Clover*—to determine whether listed risks are truly inherent risks in the context of the statute.

¶74 Given the evidence of legislative approval, public reliance, and general workability,[26] Talisker has not carried its heavy burden to persuade us to overturn this precedent and nothing today convinces us that we should overrule the core holding of *Clover*.

### III. *CLOVER'S* TEST CLARIFIED

¶75 Our overarching goal when interpreting a statute is to "implement the intent of the legislature." *State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92. In doing so, we turn first to the plain language of the statute itself. *GeoMetWatch Corp. v. Utah State Research Found.*, 2018 UT 50, ¶ 15, 428 P.3d 1064. When the language of the statute is plain and unambiguous, this court will look no further to discern legislative intent. *Savely v. Utah Highway Patrol*, 2018 UT 44, ¶ 25, 427 P.3d 1174. However, "if doubt or uncertainty exists as to the

---

[26] The dissent fails to give any credence to *Clover*'s favorable out-of-state press. But the dissent does selectively cite other cases— *Glover v. Vail Corp.*, 955 F. Supp. 105 (D. Colo. 1997) and *Hanus v. Loon Mountain Recreation Corp.*, No. 13-cv-44-JL, 2014 WL 1513232 (D.N.H. Apr. 16, 2014)—for the proposition that other courts have questioned the viability of the *Clover* framework. *Infra* ¶¶ 161–162.

These cases are not persuasive. *Hanus* simply states that it finds *Clover* unpersuasive "for the reasons discussed in *Glover*," *Hanus*, 2014 WL 1513232, at *5 n.5, so it is only as persuasive as *Glover*. And *Glover* is fundamentally flawed. Its analysis of Colorado's analog to the Act is at odds with the Colorado Supreme Court's own, authoritative interpretation.

*Glover* held that the phrase "integral part of the sport of skiing" in Colorado's Inherent Risks of Skiing Act did not require the *Glover* court to analyze whether each listed risk had, in fact, manifested in a way that was "integral" to the sport of skiing. *See Glover*, 955 F. Supp. at 109. But in *Graven v. Vail Assocs, Inc.*, 909 P.2d 514 (Colo. 1995) (en banc), the Colorado Supreme Court held that "[t]he dangers and risks detailed in [the Colorado Inherent Risks of Skiing Act] . . . . must be read with [the phrase 'integral part of the sport of skiing'] in mind"—a phrase that, the Colorado Supreme Court held, imposed a "limitation" on the extent to which the listed risks were "inherent risks of skiing" as a matter of law. *Id.* at 519. This case, which is authoritative and predates *Glover*, directly contradicts *Glover*'s approach and therefore undermines its persuasiveness.

meaning or application of an act's provisions, [we] . . . analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose." *Id.* (citation omitted) (internal quotation marks omitted).

¶76 Having acknowledged the ambiguity in the Act's definition of inherent risks of skiing, *see supra* ¶¶ 31–43, we now turn to the best way to resolve that ambiguity. As discussed earlier, *Clover* held that inclusion of a risk in the Act's exemplary list does not end the inquiry into whether that risk constitutes an inherent risk of skiing. 808 P.2d 1037, 1045 (Utah 1991). Rather, the Act requires a case-by-case analysis to determine whether the injury-causing risk is truly an inherent risk of skiing under the Act. *Id.* We agree with this holding.

¶77 To implement this holding, *Clover* announced a test that asks whether a skier "wishes (or does not wish) to confront" a certain risk. If a skier wishes to confront a risk, then it is an inherent risk. *Id.* at 1047. But if the risk is one a skier would not wish to confront, then it is an inherent risk only if a ski area operator could not eliminate the risk through the exercise of ordinary care. *Id.*

¶78 While *Clover*'s holding is faithful to the purpose of the Act, *see supra* ¶¶ 44–54, we believe that the *Clover* test could be implemented in a way that more precisely tracks the legislative intent of the Act. In announcing this clarification, we do not aim to overturn the results of our prior decisions in this area. Instead, we aim to clarify the implementation of law and more clearly bring it in line with the intent of the legislature.

¶79 The two-prong analysis under *Clover* in which a court first makes a subjective determination of whether a skier wishes to confront a risk followed by an objective determination of the ability to eliminate the risk (in the event that the risk is one a skier does not subjectively wish to confront), can be effectively collapsed into a one-step objective inquiry. Specifically, this objective inquiry asks whether a skier reasonably expects to encounter the risk when skiing.[27] If so, then the risk is an integral part of the sport of skiing

---

[27] The dissent argues that this clarification does more than clarify the holding in *Clover*. In its view, our clarification "completely rewrit[es]" *Clover* and "pays no more than lip service to the doctrine of *stare decisis*." *Infra* ¶ 90. We disagree.

(cont.)

It is true, as the dissent points out, that the clarified test does away with the two categories of inherent risks announced in *Clover* and expounded on in *White*. Indeed, we own the fact that we are "transforming a two-step subjective inquiry into a one-part objective one." *Infra* ¶ 149 n.44. But we are untroubled by this as a matter of *stare decisis* for two reasons.

First, we do not view the creation of two categories of inherent risks as the core holding of *Clover*. As explained above, *see supra* ¶ 29, the core holding of *Clover* is that there is a secondary inquiry required when evaluating whether an enumerated risk is truly an inherent risk of skiing. As we noted in *White*, "*Clover* . . . clarified the manner in which the [Act] is to be applied. Courts cannot determine that a risk is inherent in skiing simply by asking whether it happens to be one of those listed in [section 402]." 879 P.2d at 1374. Instead, "to determine whether the [Act] applies, we must decide whether the particular risk which allegedly caused [the] injury was an integral part or essential characteristic of the sport of skiing." *Id.* In this sense, we do no damage to *Clover* because the clarified test is indeed a secondary inquiry that we can use to evaluate whether an injury-causing risk, enumerated or not, is an inherent risk of skiing.

Second, the single objective inquiry of whether a skier reasonably expects to encounter a risk does the same work as the two categories of inherent risks announced in *Clover*. With respect to the first category of inherent risks in *Clover*, it seems clear that a skier reasonably *expects* to encounter those risks which he or she *wishes* to confront. And with respect to the second category, it seems equally clear that risks a skier does not wish to confront but cannot be eliminated through the use of reasonable care are largely synonymous with risks a skier reasonably expects to encounter. While a skier may not *wish* to confront certain things such as rocks, forest growth, and lift towers, a skier nonetheless reasonably *expects* to encounter these things in their ordinary state—in the context of skiing—because they are risks that cannot be eliminated through the exercise of reasonable care and therefore inhere in the sport.

Because our clarification today remains true to the core holding of *Clover* and does the same work as the *Clover* test, we view it as just that—a clarification. And we are always free to "clarif[y] ambiguities in past opinions without overruling their holdings." *In*

(cont.)

37

and therefore an inherent risk of skiing. And by extension, the list of enumerated risks captures those risks that the legislature believed to be inherent risks of skiing when they are encountered in the way that skiers would reasonably expect to encounter them. We believe this test effectively captures the legislature's intent when it announced that skiers assume the inherent risks of skiing as a matter of law.[28]

---

*re Adoption of Baby B.*, 2012 UT 35, ¶ 60 n.23, 308 P.3d 382. "Such a decision is entirely consistent with the principle of *stare decisis*." *Id.*

[28] The dissent laments that our clarification "seems to articulate two alternative standards," *infra* ¶ 185, and "sounds *alternatively* as either a question of law . . . or a fact-intensive mixed question," *infra* ¶ 91. In the dissent's view, cases decided under this framework are not decided "as a matter of law" because they could be potentially "subject to a factual negligence inquiry." *Infra* ¶ 106. We see no inconsistency in the reality that a determination under this framework may require a predicate factual inquiry in some cases—even those involving enumerated risks. A determination made under this framework may involve predicate factual findings, but the ultimate conclusion is nevertheless made as a matter of law.

It is true that the Act's public policy section states that one purpose of the Act is "to establish as a matter of law that certain risks are inherent in [the] sport [of skiing]." Indeed, the Act establishes "as a matter of law that certain risks are inherent" to skiing. But this does not lead to the conclusion that the reference to "certain risks" is a reference to the enumerated risks, as the dissent suggests. *Infra* ¶ 114. Instead, as this court held in *Clover*, those certain risks that are inherent to skiing are those risks that are "integral part[s] of the sport of skiing." 808 P.2d at 1044 (internal quotation marks omitted). Therefore, under the Act, risks that are an integral part of the sport of skiing are inherent to the sport of skiing as a matter of law.

The potential for factual inquiry, whether it be through expert testimony or otherwise, to determine whether a risk is an integral part of the sport of skiing does not affect the ultimate conclusion that any risk found to be an integral part of the sport of skiing is an inherent risk under the Act as a matter of law. In other words, once a risk has been shown to be an integral part of the sport of skiing—

(cont.)

¶80 To determine the legislature's intent we can turn to the Act's definition of inherent risks of skiing in section 402. Along with the general definition of inherent risks of skiing, the Act also provides an exemplary list of inherent risks of skiing in section 402. Crucial to our understanding of the legislature's intent is the way in which the exemplary risks are presented: the risks listed in section 402 are presented in an entirely unremarkable manner. That is, all of the risks are presented in the manner in which a skier would reasonably expect to encounter them. *See supra* ¶ 38. This is useful for understanding exactly what types of risks for which the legislature intended to bar recovery.

¶81 For example, the Act bars recovery for injury caused by impact with lift towers. The relevant inquiry in a case involving an impact with a lift tower is whether the legislature meant for the Act to cover the kind of impact with a lift tower at issue in the case. In deciphering what kinds of impact with lift towers the legislature envisioned when drafting the statute, it is telling that the legislature chose to simply use "lift towers" with no other qualifying terms. This language conjures up images of standard lift towers as any skier would reasonably expect to encounter them. Similarly, the use of "impact" suggests that the types of impacts contemplated with lift towers are those impacts that a skier could reasonably expect to occur while skiing. Interpreting the exemplary risks in this manner dispatches with the possibility of the kind of absurd or unreasonable results that the legislature could not have intended when applying the Act. *See Anderson v. Utah Cty.*, 368 P.2d 912, 913 n.3 (Utah 1962) ("[I]t is a general rule that where a statute is ambiguous in terms and fairly susceptible of two constructions, the unreasonableness or absurdity which may follow one construction or the other may properly be considered. Unreasonable, absurd, or ridiculous consequences should be avoided." (citation omitted)

---

which is done by showing that a skier would reasonably expect to encounter that risk—there is no more discussion to be had about whether that risk is inherent: risks that a skier would reasonably expect to encounter are inherent risks as a matter of law. And the import of that conclusion is that a plaintiff may not recover from a ski area operator for any injury resulting therefrom.

(internal quotation marks omitted)).[29] Instead of barring recovery for an impact with a lift tower lying on its side waiting to be erected or painted to blend in with its alpine setting, the Act bars recovery for impacts with lift towers as skiers reasonably expect to encounter them. By extension, instead of barring recovery for an injury in which the chairlift cable snaps and a skier is thrown from a lift chair into a lift tower, the Act bars recovery for impacts as skiers would reasonably expect them to occur, such as skiing out of control and crashing into an ordinary lift tower.[30]

---

[29] While we have referred to this canon as the "absurd consequences canon," *see*, *e.g.*, *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 39 n.14, 357 P.3d 992, we note that the designation is somewhat of a misnomer. Instead of encompassing only truly "absurd" consequences, this interpretive canon also applies in cases involving ambiguities that ask us to choose between two *plausible* constructions. In cases presenting two plausible readings, the absurd consequences canon, generally speaking, causes us to prefer the more reasonable interpretation, even if the less reasonable interpretation could not be accurately described as "absurd."

[30] The dissent complains that our use of the adjective "ordinary" "sounds like the framing of a legal question," while the rest of our framework "seems more of a factual inquiry." *Infra* ¶ 188. And the dissent views this as creating "internal tension" in our approach. *Infra* ¶ 188. Not so. All that is meant here by use of the word "ordinary" is that the lift tower is encountered in the way in which a skier would reasonably expect to encounter it. In some cases, such as the dissent's proposed hypothetical about a lift tower a plaintiff claims to be negligently designed, *infra* ¶ 192, a factual inquiry may be necessary to determine whether the lift tower is one skiers would reasonably expect to encounter—or in other words, whether it is an ordinary lift tower.

Furthermore, we disagree with the dissent's assertion that "we must identify what counts as part of the relevant 'way'" in which risks are encountered. *Infra* ¶ 191. There is no reason to cabin the analysis to the color, shape, placement, design, etc. of the risk in determining whether a skier would reasonably expect to encounter it. All elements of a given risk are relevant to the determination of

(cont.)

¶82 In addition to tracking the commonplace descriptions of risks in section 402, requiring an analysis of whether a skier would reasonably expect to encounter a given risk aligns with the purpose of the Act. As section 401 states, the purpose of the Act was to "clarify the law" as it existed in 1979. As discussed earlier, the Act served to reassert the defense of primary assumption of risk with respect to ski injuries. *See supra* ¶¶ 44–54. Under a primary assumption of risk analysis, the question is not necessarily whether a skier would "wish" to encounter a certain risk, but whether a risk is inherent or essential to the sport of skiing and therefore whether the risk is one that a skier reasonably expects to encounter when participating in the sport. *See*, *e.g.*, *Hansen v. Flying J Travel Plaza*, 57 Fed. App'x 214, 216 (6th Cir. 2003) ("A baseball spectator assumes the risk of injury because it is common knowledge that hard balls may be thrown or batted at great speeds into the stands."); *Fleury v. IntraWest Winter Park Operations Corp.*, 372 P.3d 349, 355 (Colo. 2016) (Marquez, J., dissenting) ("The many hazards listed in [Colorado's Inherent Risks of Skiing Act] as 'inherent dangers and risks of skiing' are common, everyday conditions that any skier . . . reasonably can expect to encounter . . . ."); *Morgan v. State*, 685 N.E.2d 202, 207 (N.Y. 1997) ("[B]y engaging in a sport . . . a participant consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally . . . ."); *Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986) ("As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation."). Regardless of whether a skier wishes to confront the inherent risks of skiing, skiers nonetheless reasonably expect to encounter those risks that inhere in the sport.[31]

¶83 Because the legislature described the listed risks in their ordinary forms and the Act served to reassert the availability of the

---

whether it was presented in the way a skier would reasonably expect to encounter it.

[31] The dissent faults us for not quantifying the level of expectation necessary for a risk to be considered an integral part of the sport of skiing. *Infra* ¶ 193. But we repeatedly state that the level of expectation required is a reasonable expectation. *See supra* ¶¶ 79–82.

defense of primary assumption of risk, we hold today that the inherent risks of skiing are those risks which a skier would reasonably expect to encounter while skiing. And with respect to the risks enumerated in section 402, those risks are inherent risks of skiing only to the extent that a skier could reasonably expect to encounter them. We believe that this clarification of *Clover* remains true to the core holding of that case while simultaneously interpreting the language of the Act in a way that comports with the intent of the legislature. And although we expect the outcomes under this clarified standard to be the same as the outcomes under the old standard, we nonetheless remand this case to the district court to determine whether a skier would reasonably expect to encounter the wet, sticky snow that Levi encountered at The Canyons.

¶84  The legislature, of course, retains the power to amend the Act and overrule our interpretation, which it has thus far declined to do. To the extent our current holding is not in line with the legislature's actual intent, "we [continue to] invite the Utah Legislature to revisit the [Act] to provide clarity in this area." *State v. McNearney*, 2011 UT App 4, ¶ 10 n.2, 246 P.3d 532.

## CONCLUSION

¶85 We affirm the court of appeals with respect to the preinjury release. The preinjury release executed by Levi's father on his behalf is void as against public policy. We also affirm the court of appeals to the extent that it chose to apply *Clover* to these facts. We remand, however, for a determination in accordance with our clarified implementation of *Clover*'s holding as to whether there exists a disputed issue of material fact with respect to the machine-made snow exemption.

———————

ASSOCIATE CHIEF JUSTICE LEE, dissenting in part:

### I. INTRODUCTION

¶86 The Inherent Risks of Skiing Act is simple and straightforward. It provides a detailed but non-exclusive list of "inherent risks" of skiing, UTAH CODE § 78B-4-402(1)—a list that includes "snow or ice conditions" of all kinds, including "machine-made snow." *Id*. § 78B-4-402(1)(b). And it bars claims

against ski resorts for injuries resulting from these and other "inherent risks" enumerated by the legislature. *Id*. § 78B-4-403.

¶87  Our case law has distorted the clear terms of this statute. In *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991), we erased the categorical bar on recovery for inherent risks of skiing listed in the statute and introduced negligence into the equation. In so doing we nullified the statutory list of inherent risks and redefined that term in accordance with a new liability regime of our own making. *Clover* conditions statutory immunity on proof that the risk in question (even one listed in the statute) is one that "no one wishes to confront" and that "cannot be alleviated by the use of reasonable care on the part of a ski resort." *Clover*, 808 P.2d at 1047.

¶88  This standard has never been elucidated in any workable detail. We have never explained how a court is to decide whether a risk is one that a skier may "wish[] to confront," or what sort of evidence may be permitted or required to prove this threshold element. The closest we have come to an explanation is a set of categorical statements in *White v. Deseelhorst*—that risks such as "steep grades, powder, and mogul runs" are risks that skiers wish to confront (and that ski resorts are thus "relieved of any obligation to eliminate"), and that risks like "bare spots, forest growth, rocks, stumps, . . . lift towers and other structures" are risks that skiers do not wish to confront (and thus that are inherent only if they cannot be "eliminated by reasonable care"). 879 P.2d 1371, 1375 (Utah 1994) (alteration in original) *abrogated on other grounds by Penunuri v. Sundance Partners Ltd.*, 2011 UT 54, 423 P.3d 1150. We have never offered any clarification on our methods of devising these categories, however. And we have never prescribed a standard or means of proving that a risk is one that "cannot be alleviated by the use of reasonable care on the part of a ski resort." *Clover*, 808 P.2d at 1047. Our opinions in this field, moreover, have been deeply divided—with various members of the court questioning the compatibility of the *Clover* framework with the text of the statute.[1]

---

[1] *See White v. Deseelhorst*, 879 P.2d 1371, 1377 (Utah 1994) (Zimmerman, C.J., concurring) (noting that he "may not agree"

(cont.)

Lee, A.C.J., dissenting in part

¶89  These and other concerns prompted us to invite the parties to submit supplemental briefs on whether we should reformulate the *Clover* standard of liability. The petitioners responded with an extensive showing of the basis for repudiating the *Clover* standard under our doctrine of *stare decisis*. They have highlighted the degree to which *Clover* distorts the legal framework enacted by the legislature—depriving the statutory list of inherent risks of any meaning, and replacing the statutory grant of immunity with a vague inquiry into negligence. And they have questioned the workability of the existing framework by noting the difficulty of (and lack of any guidance in our cases on) deciding whether a risk is one that a skier "wishes to confront." The respondents, for their part, asked us to retain the *Clover* framework. They urged a reaffirmation of this precedent under the doctrine of *stare decisis*. But they offered little or no help in prescribing a workable means of applying *Clover* to a case like this one.

¶90 The majority rejects the petitioners' request that we repudiate *Clover*. It opines at length about the importance of the doctrine of *stare decisis*. And it purports to "clarify" and "streamline" the *Clover* standard in a way that renders it more transparent and workable. *Supra* ¶¶ 3, 12. For all its fulmination, however, the court pays no more than lip service to the doctrine of *stare decisis*—stating a patriotic commitment to *Clover* as super precedent in one breath while completely rewriting the *Clover* standard in the next. The rewriting is substantial. The majority replaces the two-part standard from *Clover* with a one-part standard of its own making. Under the majority opinion we ask only what a "reasonable skier" would "expect to confront." We have reframed the first step and eliminated the second. And we apparently have abandoned the two categories of risks set forth in *White*—with "steep grades, powder, and mogul runs" on the "wish to confront" side and "'bare spots, forest growth, rocks, stumps, . . . lift towers and other structures'" on the "prefer to avoid" side.

---

with *Clover*); *id.*, (Russon, J., dissenting) (asserting that Clover "contradicts the plain language" of the statute).

¶91 Despite this reformulation, the court does nothing to solve the workability problems that have plagued our courts for decades and that prompted our supplemental briefing order and multiple oral arguments in this court. The court relabels the standard—replacing the verb "wish" with "expect." And it frames the question in objective terms. But the court's opinion never answers any of the practical questions that we posed to the parties in our supplemental briefing order. In fact, it compounds the unworkability of *Clover* by presenting a standard that sounds *alternatively* as either a question of law (as to whether the risk in question is presented in a manner that falls within the ordinary meaning of the terms of the statutory list) or a fact-intensive mixed question (as to whether a reasonable skier would expect to encounter the type of risk that is presented in the relevant circumstances). *See infra* Part II.D (discussing this problem). And the majority never tells us how either of these standards is to be established—by the court as a matter of law, or by a fact-finder weighing evidence. Nor does the court clarify what it means for a given risk to be "expected," or how expectation is to be proven (through expert testimony, etc.). *See infra* Part II.D.

¶92 We can do better. Once we own up to the fatal workability problems with *Clover* we should do more than just rearrange deck chairs. We should state a clear, workable standard that gives voice to the statutory scheme enacted by our legislature. I would do so. I would apply the Inherent Risks of Skiing Act as written and hold that the petitioners are entitled to immunity under the statute if they can establish that the plaintiff's injuries in this case resulted "from any of the inherent risks of skiing," UTAH CODE § 78B-4-403, listed in the statute, such as "snow or ice conditions as they exist or may change," including "machine-made snow," and "variations . . . in terrain" resulting from "snowmaking or grooming operations." *Id.* § 78B-4-402(1)(b),(d). I would interpret the listed "[i]nherent risks of skiing" in their ordinary sense. And I would reverse and remand to allow the parties to present evidence and argument to the district court on the question whether the injury in question resulted from these or other inherent risks of skiing.

¶93 This approach respects the independent meaning canon and related canons cited by the majority. *See supra* ¶¶ 33-38. The

cited canons all emphasize a central point—that the statutory definition of "[i]nherent risks of skiing" includes a phrase ("an integral part of the sport of . . . skiing") that should be given independent meaning as a modifier of the statutory "[i]nherent risks." But that is common ground. Everyone agrees that the "integral part of the sport" clause has this independent meaning as a modifier. The question is *how* the modifier works—in particular, whether it calls for a court to make an independent assessment of whether even a *listed* risk of skiing is "integral" to the sport, or whether listed risks are deemed categorically "integral" by being listed. I see no basis for the former approach. It fails because it completely nullifies the detailed statutory list of inherent risks. My reading, by contrast, gives meaning both to the statutory list and to the "integral part of the sport" clause.

¶94 Under my reading, listed risks are categorically included as "[i]nherent risks of skiing." That is the whole point of the statutory list. *See* UTAH CODE § 78B-4-401 (emphasizing that the statute's purpose is to "establish as a matter of law that *certain risks* are inherent in th[e] sport" (emphasis added)); *id.* § 78B-4-402(1) (indicating that listed risks are "includ[ed]" in the "dangers or conditions which are an integral part of the sport of . . . skiing"). And that list can be treated as categorical without depriving the "integral to the sport" clause of its own meaning. The statutory definition, after all, also encompasses unlisted risks—the list is only exemplary. So for an unlisted risk a court must make its own independent assessment of whether it is an "integral part of the sport" of skiing. That is the independent meaning of this clause.

¶95 My approach also leaves room for the majority's concerns about "absurd" applications. If a ski area operator were ever to stoop to the folly of constructing a "lift tower" that is "practically invisible to skiers," *supra* ¶ 39, an injured skier could simply assert that such a tower does not fall within the ordinary meaning of the sort of "lift tower" that is "includ[ed]" as an "[i]nherent risk[]" of skiing." Or, alternatively, the injured skier could seek resort in the doctrine of absurdity—a safety valve built into our law of interpretation that is designed specifically to deal with the kinds of absurd problems that the majority has imagined. If and when these sorts of outliers come to the court, we could then decide whether to

override clear statutory text on the ground that "no rational legislator could *possibly* have intended" such an application. *Garfield Cty. v. United States*, 2017 UT 41, ¶ 23 n.55, 424 P.3d 46. But that is not what the majority is doing here. It is not saying that the circumstance before us in this case is so absurd as to justify an isolated departure from the statutory text on the facts of this case. It is conjuring absurd possibilities to support the sweeping conclusion that the statute can *never* mean what it says. That is not how the doctrine of absurdity works. Or at least it is not how it has ever worked before today. *See* John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2388 (2003) (noting that the absurdity doctrine operates to override the text when a "given application" would produce absurd results).

¶96  I respectfully dissent. I would hold that the Inherent Risks of Skiing Act means what it says. And I would reverse and remand to allow the district court and the parties to assess the question of liability in this case in accordance with the statutory standard.

II. ANALYSIS

¶97  In enacting the Inherent Risks of Skiing Act, the legislature found that the sport of skiing "significantly contribut[es] to the economy of this state" and concluded that insurance "premiums" for "ski area operators" "have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing." UTAH CODE § 78B-4-401. With these concerns in mind, the legislature also adopted a statement of "purpose": "to clarify the law in relation to skiing injuries and the risks inherent in that sport, to establish as a matter of law that certain risks are inherent in that sport, and to provide that, as a matter of public policy, no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks." *Id*. The operative terms of the statute effectuate this purpose. But *Clover* overrides those statutory terms. And it does so in a manner that is unworkable and thus unworthy of deference under our doctrine of *stare decisis*.

¶98  I set forth the basis for my conclusions and my response to the majority in the paragraphs below. First I highlight the incompatibility of *Clover* with the text of the Inherent Risks of

47

Skiing Act. Second, I explain the basis for my conclusion that *Clover* is not only wrong but so clearly wrong and so unworkable that the usual presumption of *stare decisis* is rebutted. Third, I articulate a legal standard that is dictated by the text and structure of the Inherent Risks of Skiing Act and describe the grounds on which I would reverse and remand the case to the district court. Fourth, I highlight problems and unanswered questions with the majority's reformulation of the *Clover* test, emphasizing that the new test represents a substantial departure from the old one while also managing not to answer any of the practical problems highlighted by the parties in their briefing in this case.

### A. *Clover* is Incompatible with the Statute

¶99 The text of the Inherent Risks of Skiing Act is clear, straightforward, and categorical. It says that "no skier may make any claim against, or recover from, any ski area operator for injury resulting from any of the inherent risks of skiing." *Id.* § 78B-4-403.

¶100  The statute also prescribes a comprehensive definition of the "inherent risks of skiing." It says that "'[i]nherent risks of skiing' means those dangers or conditions which are an integral part of the sport of recreational, competitive, or professional skiing." *Id.* § 78B-4-402(1). And it sets forth a list of risks that are "includ[ed]" in the statutory definition. *Id*. The non-exclusive statutory list includes "snow or ice conditions as they exist or may change, such as hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, or machine-made snow." *Id*. § 78B-4-402(1)(b) It also includes "variations or steepness in terrain, whether natural or as a result of slope design, snowmaking or grooming operations, and other terrain modifications." *Id.* § 78B-4-402(1)(d) These terms, as noted, should be interpreted in accordance with their ordinary meaning.

¶101 The *Clover* framework overrides the categorical immunity called for by the statute. It does so by obliterating the concept of statutory immunity for enumerated risks "establish[ed] as a matter of law," *Id.* § 78B-4-401, and "includ[ed]" in the definition of "[i]nherent risks of skiing," *id*. § 78B-4-402(1), and substituting instead an assessment of whether any given risk

should qualify for statutory protection "under the facts of each case." *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1044 (Utah 1991).

¶102 Under *Clover* the statutory list of "inherent risks of skiing" is superfluous. *Infra* ¶¶ 114–18. Instead of embracing the statutory list the *Clover* court replaces it with two new tiers of "risks of skiing"—those risks skiers "wish to confront" and those they do not. *Clover,* 808 P.2d at 1046–47. Under *Clover*, "[t]he inherent risks of skiing are those dangers that skiers wish to confront as essential characteristics of the sport of skiing or hazards that cannot be eliminated by the exercise of ordinary care on the part of the ski area operator." *Id.* In other words, *Clover* divides the "inherent risks of skiing" into "two categories": (1) those "risks, such as steep grades, powder, and mogul runs, which skiers wish to confront as an essential characteristic of skiing"; and (2) those risks "which no one wishes to confront but cannot be alleviated by the use of reasonable care on the part of a ski resort." *Id.* at 1047.

¶103 These "categories" bear no relation to the text and structure of the Inherent Risks of Skiing Act. The statute makes no mention of the inquiry into the skier's mindset—of wishing, or not wishing, to confront certain risks. And the statutory list of "inherent risks" leaves no room for the *Clover* court's formulation. The statute treats all listed risks equally. All are identified as "inherent risks of skiing." And all are on parallel statutory terms.

¶104 The *Clover* court overrides this structure. It says that some of the listed risks qualify for statutory immunity but others do not. And it says that the dividing line depends on a criterion nowhere listed in the statute—on whether it is a risk skiers "wish to confront."

¶105 The *Clover* opinion provides no definition of this crucial criterion. But it does identify some of the risks listed in the statute that purportedly qualify for statutory protection: "steep grades, powder, and mogul runs." *Id*. This only highlights the incompatibility of the *Clover* standard with the terms and structure of the Inherent Risks of Skiing Act. Perhaps there are good policy reasons for treating risks like "steep grades, powder, and mogul runs" differently from other, more treacherous risks identified by the legislature—like "bare spots, forest growth, rocks, stumps,

streambeds, cliffs, trees, and other natural objects," or "impact with lift towers and other structures and their components such as signs, posts, fences or enclosures, hydrants, or water pipes." UTAH CODE § 78B-4-402(1)(c),(e). And maybe the intuition behind this policy is that skiers generally "wish [or expect] to confront" only the former risks as a necessary part of skiing. But this policy is not the one embraced by the legislature.

¶106   The Inherent Risks of Skiing Act also affords categorical immunity to enumerated risks of skiing "as a matter of law." *Id.* § 78B-4-401. But *Clover* reintroduces a negligence standard, asking whether the risk can "be alleviated by the use of reasonable care." *Clover*, 808 P.2d at 1047. If so, the ski resort can be held liable. With that in mind, I cannot think of a single "inherent risk" that would not be subject to a factual negligence inquiry, and thus actually be decided "as a matter of law" as contemplated by the statute.[2] *Infra* ¶ 145. Both prongs of the *Clover* framework are thus incompatible with the statute because they override the clear terms and structure of the Act.

¶107   The majority offers a series of defenses of the merits of the *Clover* framework—arguing that it: (1) is consistent with the "structure" of the statute and certain canons of construction, *supra* ¶¶ 33–38; (2) better advances the stated legislative goal of "'clarify[ing] the law,'" *supra* ¶ 44   (quoting *Clover*, 808 P.2d at 1045); (3) avoids absurd or arbitrary consequences, *supra* ¶ 41; and (4) furthers the interests of the doctrine of constitutional avoidance,

---

[2] My point is not that legal questions are never subject to a "predicate factual inquiry." *Supra* ¶ 79 n. 28. It is that the legal standards prescribed by this statute—in a list of risks deemed "inherent" as a matter of law—cannot properly be subject to such an inquiry. In subjecting it to a fact-intensive negligence inquiry, the majority deprives the statutory list of its expressly intended effect (of establishing inherent risks as a matter of law). The problem here, moreover, is that the standard articulated by the majority does not just "require a predicate factual inquiry *in some cases*." *Supra* ¶79 n.28 (emphasis added). It requires such an inquiry in *every* case—as to listed statutory risks and unlisted risks alike. This makes the list entirely ineffectual.

*supra* ¶¶ 55-58. None of these points is persuasive. I respond to each below.

### 1. Statutory Structure and Canons of Construction

¶108 The majority claims that *Clover* respects the "structure" of the Inherent Risks of Skiing Act. It cites a series of canons that it views as reinforcing the framework set forth in that decision. *Supra* ¶¶ 33-38.

¶109 The "structure" cited by the majority is the phrase "integral part of the sport of . . . skiing." The majority hangs its textual defense of *Clover* on this clause. It notes that this clause is an element of the definition of the "[i]nherent risks of skiing." And it cites the independent meaning canon to emphasize the independent function of this provision in the statutory definition of the "[i]nherent risks of skiing." The majority's insistence on the independent role of the "integral part of the sport" clause is unassailable. But it is also unhelpful to the defense of *Clover*.

¶110 I have no quarrel with the proposition that the "integral part of the sport" clause "provides important, independent value" in the statute. *Supra* ¶ 37. This provision, moreover, surely "modifies the 'dangers' and 'conditions'" that count as an "[i]nherent risk[] of skiing." It does not follow, however, that the question whether a danger—be it listed or not—is covered by the statute requires a "case-by-case analysis" of whether that risk is an integral part of the sport. *Supra* ¶ 29.

¶111 That is a premise of *Clover*. But that premise overrides and completely discredits the statutory list of inherent risks— treating it as an exercise in futility. That cannot be the right way to interpret this statute. The statutory list of risks must have some meaning. And we can preserve independent meaning for the list while also crediting the "integral part of the sport" clause.

¶112 There is a straightforward way to preserve independent meaning for both the "integral part of the sport" clause and the statutory list of "inherent risks." All we have to do is recognize the dual nature of the statutory definition. By statute, both listed and unlisted risks may qualify as "inherent risks of skiing." The operative provision thus consists of a general definition of

"[i]nherent risks of skiing" and a list of risks that are "includ[ed]" in that definition:

> (1) "Inherent risks of skiing" means those dangers or conditions which are an integral part of the sport of recreational, competitive, or professional skiing, including, but not limited to:
>
> (a) changing weather conditions;
>
> (b) snow or ice conditions as they exist or may change, such as hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, or machine-made snow;
>
> (c) surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, trees, and other natural objects;
>
> (d) variations or steepness in terrain, whether natural or as a result of slope design, snowmaking or grooming operations, and other terrain modifications such as terrain parks, and terrain features such as jumps, rails, fun boxes, and all other constructed and natural features such as half pipes, quarter pipes, or freestyle-bump terrain;
>
> (e) impact with lift towers and other structures and their components such as signs, posts, fences or enclosures, hydrants, or water pipes;
>
> (f) collisions with other skiers;
>
> (g) participation in, or practicing or training for, competitions or special events; and
>
> (h) the failure of a skier to ski within the skier's own ability.

UTAH CODE § 78B-4-402. The "integral part of the sport of . . . skiing" clause is significant. This clause states the general precondition for a risk to qualify as "inherent." It makes clear that

any risk may qualify as "inherent" if it is an "integral part of the sport" of skiing.

¶113    This is a clear, independent function of the "integral part of the sport of skiing" clause. It forms the backbone of the statute's generally applicable definition of "inherent risks of skiing." For unlisted risks it is the controlling inquiry.[3]

---

[3] For unlisted risks I agree with the majority's invocation of the *ejusdem generis* canon of construction. *See supra* ¶ 38. In defining risks "not covered" by the statutory list we should undoubtedly look to the "character and nature" of the listed risks. *Supra* ¶ 38. But the majority takes this canon a couple of puzzling steps further. First is the assertion that the statutory list is useful (and not superfluous) simply *because* it can inform the meaning of the catchall definition of risks not included in the express list. *Supra* ¶ 38. This is a distortion of the canon, or a use of *ejusdem* that would invoke a wholesale override of the independent meaning canon. Statutory lists certainly inform ambiguities in catchall fallbacks. But I have never encountered the idea that that is the whole point of a statutory list—or that we can ignore the straightforward application of a list because its sole function might be to inform the meaning of the catchall. This use of *ejusdem* would do more than override the canon of independent meaning; it would defy common sense. And it would give us a license to ignore clear statutory lists—lists clearly intended to have independent meaning—because the only meaning of the list may be to inform a catchall term.

This leads to the second problem with the majority's use of this canon. The court is effectively turning the canon upside down. "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012). The canon tells us that the meaning of the "catchall phrase" is informed by the character or nature of the enumerated "specifics." *Id.* But the majority isn't interpreting the catchall—the definition of unlisted risks. It is "interpreting" (I would say overriding) the enumerated specifics. And it is doing so by incorporating an element of the catchall definition—"integral part of the sport" of skiing—to override the terms on the list. This

(cont.)

¶114  It does not follow, however, that the statute leaves a court free to make its own independent assessment of whether a *listed* inherent risk is an "integral part of the sport of . . . skiing." The whole point of the statutory list is "to establish as a matter of law that certain risks are inherent in th[e] sport" of skiing. *Id.* § 78B-4-401. And the list is rendered superfluous if enumerated risks are still subject to elimination if they are not deemed "integral" to skiing.[4]

_____

isn't how it works. I know of no basis for considering the "character and nature" of listed risks in deciding whether listed risks count. Certainly that's not what *ejusdem generis* is about. The majority's approach is a gross distortion of the *ejusdem generis* canon.

[4] In a puzzling attempt to avoid this problem the majority notes that section 404 of the Act "requires ski area operators to post warning signs that list the inherent risks of skiing set forth in section 402." *Supra* ¶ 37. And it suggests that the list in section 402 may function simply to tell the ski area operator which risks to list on its warning signs. This assertion falters on two grounds. First, the majority ignores the express, obvious function that listed risks have under the statute—not just in establishing the components of a warning sign but in barring skiers from asserting "any claim against, or recover[ing] from, any ski area operator for injury resulting from any of the inherent risks of skiing." UTAH CODE § 78B-4-403. This is the heart of the Act. *See id.* § 78B-4-401 (stating that the "purpose" of the statute is "to provide that, as a matter of public policy, no person engaged in th[e] sport [of skiing] shall recover from a ski operator for injuries resulting from th[e] inherent risks" of the sport). The majority says that warning signs provide "important, independent value." *Supra* ¶ 37. But its approach eliminates the express, core function of a list of "inherent risks," yielding no independent meaning to the independent function of providing immunity for injuries arising from listed risks. The court is right that the statute's requirement of a warning sign is a separate one. But the requirement makes no sense as understood by the majority. Surely the point of a "warning sign[] that list[s] the inherent risks of skiing set forth in section 402," *supra* ¶ 37, is a warning sign that means something. Yet the warning sign

(cont.)

54

¶115 The "integral part of the sport" clause thus plays a central, independent role in the statutory definition. It modifies the definition of "[i]nherent risks of skiing." But the question is how the modifier works—whether it calls for an independent judicial assessment of whether even listed risks are "integral," or whether listed risks are categorically deemed "integral" by being listed. The latter reading is the correct one. And it is the only one that preserves independent meaning both for the "integral part of the sport" clause and for the statutory list of "includ[ed]" inherent risks.

¶116 The statutory list is extensive and detailed but non-exhaustive. It comes on the heels of the general definition—which consists of the "integral part of the sport" of skiing clause—as a set of dangers that are "includ[ed]" in the definition. *See id.* § 78B-4-402(1) (stating that the "[i]nherent risks of skiing" "includ[e]" but are "not limited to" the listed dangers). *Clover* also renders that proviso superfluous. It says that listed dangers may or may not be included—it depends on whether a court deems them "integral" in the sense of being risks skiers "wish to confront." This is yet another problem with the *Clover* framework.

¶117 We have never clearly stated what it means for a risk to be one that skiers "wish to confront." But we have asserted that some of the risks listed by the legislature are "inherent" in skiing and that others are not. We have characterized "steep grades, powder, and mogul runs" as "inherent" in the sport of skiing,

---

as imagined by the majority is pointless. If inherent risks listed by the legislature are not controlling, as *Clover* and the majority indicate, *see infra* Part II.D., then a ski resort would have no reason to list those risks on a posted sign. Instead the sign should tell skiers that skiing will subject them to risks that a reasonable skier would "expect to confront," however that standard may be defined. This is the second problem with the notion that the warning sign required by section 404 gives independent meaning to the statutory list of inherent risks. The majority has rendered the list irrelevant. And that also renders the required warning sign superfluous.

while insisting that "'bare spots, forest growth, rocks, stumps, . . . lift towers and other structures'" are not inherent "[i]f they can be eliminated by reasonable care." *See White*, 879 P.2d at 1375 (citation omitted). But these propositions are utterly irreconcilable with the clear text of the statute. By statute, all of the foregoing conditions are "includ[ed]" as "[i]nherent risks of skiing." *See* UTAH CODE § 78-B-4-402(1)(c)-(e) (stating "bare spots, forest growth, rocks, stumps," "variations or steepness in terrain," and "impact with lift towers and other structures" are all inherent risks). And a legal regime that sweeps away the obvious point of this statutory list cannot be viewed as compatible with the statute.

¶118   There is an irony in the majority's resort to canons that emphasize the importance of preserving independent meaning for each provision of a statute. I endorse those canons. But they cut against the *Clover* approach and in favor of the statutory framework that I have outlined. My approach preserves meaning for each separate clause—for the "integral part of the sport" clause and for the enumerated list of "[i]nherent risks." *Clover*, by contrast, proffers a construction of the first of these clauses that utterly obliterates the second. And that is incompatible with the canons identified by the majority and thus fatal to the *Clover* regime.

2. The Statutory Goal of Clarifying the Law

¶119   The majority next asserts that *Clover* is consistent with "the codified purpose" of the Inherent Risks of Skiing Act. *Supra* ¶ 32 n.10. Again citing *Clover*, the majority contends that "the purpose of the statute was 'to clarify the law, not to radically alter ski resort liability.'" *Supra* ¶ 32 n.10 (quoting *Clover*, 808 P.2d at 1045). And it insists that the *Clover* court reasonably "recognized that, unless the Act was construed to allow suits arising from the negligence of ski area operators—*i.e.*, from any risks that were not integral to the sport—the statute would effectively abolish the negligence cause of action against ski area operators." *Supra* ¶ 32 The majority further claims that this "understanding of the Act comports with the self-described purpose of the Act to 'clarify the law.'" *Supra* ¶ 52. And the court describes at great length the clarification that it attributes to the legislature—a restoration of

Lee, A.C.J., dissenting in part

"the law of ski resort liability as it existed prior to [a] perceived erosion of the defense of assumption of risk." *Supra* ¶ 49.

¶120 The majority notes that *Clover* cited *Wright v. Mansfield Lift, Inc.*, 96 F. Supp. 786 (D. Vt. 1951), "for the proposition that 'when the [Inherent Risks of Skiing Act] was enacted the majority of jurisdictions employed the doctrine of primary assumption of risk' to ski area operator liability." *Supra* ¶ 50. "Relying on the doctrine of primary assumption of risk," the *Clover* court "concluded that the Utah legislature was attempting to define and clarify the duty of ski area operators under this existing doctrine." *Supra* ¶ 50. And the majority today says that this "appears to be correct." *Supra* ¶ 50.

¶121 I have no quarrel with the idea that the Inherent Risks of Skiing Act was "clarifying" our law. And I have no doubt that the statute speaks to an area of the law previously covered by the common law doctrines of primary and secondary assumption of risk. But I see no basis for the conclusion that the statute was merely restoring a body of common law cases. The statute, of course, says nothing about restoring a ski area operator's right to "raise a defense of primary assumption of risk against a skier's claim for liability." *Supra* ¶ 51. And it certainly does not say that "ski area operators owe a duty to exercise reasonable care, but a skier assumes the inherent risks of skiing to the extent that those risks persist after the ski area operator's exercise of reasonable care." *Supra* ¶51. Those might be good policies. But they are not the policies set forth in the statute.

¶122 The statute does identify a purpose of "clarify[ing]" the law in this area. *See* UTAH CODE § 78B-4-401. But that does not tell us *what* clarification the legislature had in mind. It doesn't tell us whether the clarification involved a minor alteration of the law or a "radical" one. *See supra* ¶ 51. To discern the nature and extent of the clarification we have to look at the text of the statute.[5]

---

[5] The majority says that the Act "conflate[s]… two forms of assumption of the risk." *Supra* ¶ 51 n.18. But that highlights the atextual nature of the *Clover* framework. That framework essentially says that (a) the purpose of the law was to restore the

(cont.)

¶123 The statute speaks of clarification after lamenting "confusion" in the law "as to whether a skier assumes the risks inherent in the sport of skiing." UTAH CODE § 78B-4-401. That suggests that the clarification accomplished by the statute is in setting out a bright-line rule in a previously murky area. The statutory definition of "inherent risks of skiing" does just that. It furthers the legislature's stated purpose of "establish[ing] as a matter of law that *certain risks* are inherent in th[e] sport" of skiing. *Id.* § 78B-4-401 (emphasis added). The statutory clarification is thus enhanced by giving effect to the plain meaning of the enumerated list of inherent risks of skiing. So the general reference to the goal of clarification does nothing to support the obliteration of the statutory framework established by the *Clover* decision.

¶124 The problem with the majority's approach is not its general premise that the Inherent Risks of Skiing Act "clarif[ies] the law" by codifying the doctrine of primary assumption of risk. It is its specific conclusion as to which risks are subject to that doctrine. The statute says that listed risks are "inherent" and thus beyond the defendant's duty to discover and prevent. Yet the majority rejects that conclusion, adopting instead a standard under which no risk is categorically inherent—not even a risk listed in the statute.

¶125 The majority seeks to "bolster[]" its approach by noting the absence of the word "negligence" in the statute. *Supra* ¶ 53. It finds it "nigh impossible to believe that the legislature intended to completely abolish the negligence cause of action with respect to enumerated risks when the Act itself says nothing about negligence." *Supra* ¶ 53. And it finds the abolition of negligence claims arising from inherent risks of skiing a large "elephant" unlikely to be hidden in the "mousehole" of the Inherent Risks of Skiing Act. *Supra* ¶ 53. I see this differently. I see neither an *elephant* nor a *mousehole*.

---

doctrine of primary assumption of risk, but (b) the text of the statute is just mistaken in the way it deals with it. I see a better way around this tension. I would just credit the text of the statute.

¶126    The statute, as all agree, addresses an area of our law that had long been in a state of confusion—the applicability of the doctrine of primary assumption of risk to the sport of skiing. We also all agree that the statute establishes a bar on tort claims for risks that are deemed "inherent" and an "integral part of the sport." With that in mind, there is nothing elephant-ish about the establishment of a bar on a negligence claim for injuries arising from inherent risks of skiing. Nor is there anything mousehole-ish about the terms of the Inherent Risks of Skiing Act. The majority is right that the statute never uses the term negligence. But it speaks clearly, and in even more sweeping language—in expressly establishing the "purpose" of "provid[ing] that, as a matter of public policy, no person engaged in th[e] sport [of skiing] shall recover from a ski operator for injuries resulting from th[e] inherent risks" of the sport, UTAH CODE § 78B-4-401, and categorically providing that "no skier may make any claim against, or recover from, any ski area operator for injury resulting from any of the inherent risks of skiing," *id.* § 78B-4-403.[6]

¶127    I read these provisions to sweep even more broadly— and clearly—than a bare statement of repudiation of a "negligence"

---

[6] The Inherent Risks of Skiing Act, as written, has some overlap with the doctrine of primary assumption of risk. *See supra* ¶ 51. But it cannot be said that the statute defines the "inherent risks of skiing"—those for which a ski area operator is presumed unable to discover or prevent—by means of a case-by-case inquiry into whether the risk was encountered in an "expected" manner. Such a regime is irreconcilable with a statute that identifies specific categories of risks that are "inherent" in skiing and for which "no skier may make any claim."

A statutory list of risks that are expressly "inherent" in the sport of skiing is thus no "major departure" from the law of primary assumption of risk. *See supra* ¶ 53 n.20. The statute takes the concept of primary assumption of risk and makes it more concrete and predictable—by specifying which risks count as inherent. This is no "elephant." And the Inherent Risks of Skiing Act is no "mousehole." A statute by that name is precisely the place we would expect to find a list of enumerated risks.

claim for injuries arising from inherent risks of skiing. Granted, the legislature never said it was abrogating a "negligence" claim against ski resorts. But it did say that it was abrogating "any claim against, or recover[y] from, any ski area operator for injury resulting from any of the inherent risks of skiing." *Id.* And this is no mousehole. It's a sweeping statement that "any" and all "claim[s]" or attempts to "recover" are barred. This is an elephanthole (or whatever we would call the type of large chasm an elephant might crawl into)—and a clear statement by the legislature that the majority has rendered meaningless.

### 3. "Absurd Consequences"

¶128   The majority next hypothesizes "absurd" applications of the plain language of the statute that *Clover* purportedly avoids. The majority imagines "intentionally camouflaged" lift towers that are "practically invisible to skiers." *Supra* ¶ 39. It "cannot be right," in the majority's view, that a collision which such nefarious death-traps is covered by the statute. And because the court sees such a conclusion as "inevitable," *Supra* ¶ 39., it invokes the absurd consequences canon to justify the *Clover* standard.

¶129   This is problematic. Legislative line-drawing may often seem arbitrary. But that is no license for judicial rewriting of legislation. We may override clear statutory text only in the very rare event that the language enacted into law is not just arbitrary but outright absurd—"so absurd that no rational legislator could *possibly* have intended it." *Garfield Cty. v. United States*, 2017 UT 41, ¶ 23 n.55, 424 P.3d 46.

¶130   The list of risks in the Inherent Risks of Skiing Act is hardly absurd. It consists of dangers that the legislature considered to be inherent in the sport. And for those dangers the statute calls for immunity for ski area operators. Yet the statute does not foreclose immunity for other risks. For unlisted risks the statute calls for a case-by-case determination of whether the risk is a "danger[] or condition[] which [is] an integral part of the sport" of skiing. UTAH CODE § 78B-4-402.

¶131   This is a sensible legal framework. An "impact" with a "lift tower[]" is a listed "inherent risk." *See* UTAH CODE § 78B-4-402(1)(e). But an invisible lift tower could reasonably be

dismissed as a deviation from the ordinary understanding of "lift tower," and thus falling outside the terms of the statute. If so, the statute's language would not be interpreted to stretch to cover such a deviation. *See supra* ¶ 39. The same may hold for the majority's example of the "pile of rocks intended for later landscaping placed in the middle of a beginner run." *Supra* ¶ 43. The listed risk, after all, speaks not of "rocks" in the abstract, but of "surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, trees, and other natural objects." UTAH CODE § 78B-4-402(1)(c). And a man-made "pile of rocks" placed artificially on a ski run "for later landscaping" at least arguably would not qualify as a "natural" "surface or subsurface condition." *Natural* surface or subsurface conditions presumably would be limited to relatively permanent conditions existing in nature, and would not extend to conditions created temporarily by human intervention.[7]

¶132 Yet we need not decide the "invisible lift tower" or "pile of rocks" cases to resolve the one before us today. Our law of interpretation bears tools that are suited to the resolution of the

---

[7] My conclusions here are tentative—phrased in terms of interpretations that *arguably* could hold—because the majority's hypotheticals are not now presented for our decision. I see no reason to offer a conclusive answer in the absence of a specific controversy and briefing from the parties. My tentativeness, however, cannot reasonably be taken as an indication that my approach "lends itself" to the same sort of unpredictability that inheres in the majority's standard. *Supra* ¶ 43 n.16. At most the majority has observed that a statute like the Inherent Risks of Skiing Act will present a few difficult questions of statutory interpretation. That will always be true for any statute. But this observation is no reason to ignore clear statutory language and to substitute in its place an indeterminate balancing test of the court's own making. That test guarantees indeterminacy and unpredictability in every case that will come before our courts. We cannot justify that kind of test by noting that an inquiry into the meaning of statutory language will occasionally raise some difficulties.

majority's hypotheticals—and that would allow us to do so without distorting the statute in a case that is more standard (and in no way presents any concerns about absurdity). The principal tool is the doctrine of absurdity.

¶133   This doctrine yields limited power for courts to override the clear terms of a statute. We may do so, however, only in the rare, limited circumstance in which we can conclude that "no rational legislator could *possibly* have intended it." *Garfield Cty.*, 2017 UT 41, ¶ 23 n.55. When we do so, moreover, we do not strike the statute down, or distort its terms as applied to standard (non-absurd) circumstances. We simply foreclose the application that is deemed to satisfy the high bar of absurdity. *See* John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2388 (2003) (stating that the absurdity doctrine allows departure from "clear[] statutory text" when a "given application" would produce an absurd result). The majority distorts the absurdity doctrine here. It employs hypothetical circumstances that might test the limits of the statutory text *not* to foreclose application of the statute to those specific circumstances, but to rewrite the statute more generally.[8] This is problematic. We have no authority (certainly not in the doctrine of absurdity) to rewrite statutes generally just because we

---

[8] The difficulty with the majority's approach is evident in its treatment of the "twenty-yard bare spot" hypothetical. *See supra* ¶ 43 n.15. Such a condition concededly falls within the plain terms of the statute. A bare spot is a bare spot, and thus an inherent risk of skiing, regardless of its size. But the bare possibility of the statute's application to a very large bare spot is no license for a decision to rewrite the statute in a manner that overrides its plain language quite generally. Perhaps this application would be the kind of absurdity that would allow the court to decide that no rational legislator could have intended such an application. But the mere possibility of this kind of carve-out for this kind of unusual application is no reason for us to override the statutory language more generally.

can imagine some difficult (possibly absurd) applications in future cases.[9]

## 4. Constitutional Avoidance

¶134  A final point raised by the majority is its assertion that *Clover* is justified on constitutional avoidance grounds. *Supra* ¶¶ 55-58. The constitutional concern is one flagged in *Clover*—that a view of the statute that forecloses negligence claims against ski area operators "could violate the Open Courts Clause of the Utah Constitution." *Supra* ¶ 55.

¶135  I do not see this as a basis for preserving *Clover*. Our doctrine of constitutional avoidance is a limited one. It "is not a license to rewrite statutes." *Orlando Millenia, LC, v. United Title Servs. of Utah, Inc.*, 2015 UT 55, ¶ 84, 355 P.3d 965. "It is a tool for interpreting them." *Id*. Thus, "for the constitutional avoidance canon to even apply, 'the statute must be genuinely susceptible to two constructions.'" *Utah Dept. of Transp. v. Carlson*, 2014 UT 24, ¶ 24, 332 P.3d 900 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998)). Where "one of two proposed interpretations of a statute can be eliminated as untenable, we must reject in favor of the one that more clearly advances the intent of the legislature." *Id*.

¶136  A more aggressive use of the canon, we have warned, "can easily undermine legislative intent." *Id*. And that would be the effect of the use of this canon here. The legislature has spoken clearly in delineating a list of inherent risks of skiing for which a ski area operator is insulated from liability for negligence. We should respect the legislature's judgment. We cannot properly override it

---

[9] The majority seeks to avoid this problem by insisting that it is not applying the absurdity "doctrine" to override the clear language of the statute but instead is just considering the absurd consequences "canon" to inform its understanding of ambiguous language. *Supra* ¶ 41 n.14. I see no way to justify that approach, as I see no ambiguity in the statute. Because the majority is overriding the clear import of the statutory text it should justify its decision under the doctrine of absurdity. The majority's inability to do so highlights the problems with the its approach.

just because we have identified some vague constitutional question. *See id.* ¶ 24 n.4 (citing Richard L. Hasen, *Constitutional Avoidance and Anti–Avoidance by the Roberts Court*, 2009 SUP. CT. REV. 181, 189) (noting that some invocations of the canon seem to "signal[ ] a Court that is actively engaged in shaping law and policy, not acting modestly"); *see also United States v. Marshall*, 908 F.2d 1312, 1318 (7th Cir. 1990) ("The canon about avoiding constitutional decisions . . . must be used with care, for it is a closer cousin to invalidation than to interpretation.").

¶137   This is not to say that the constitution should play no role in the disposition of this case. It is important to emphasize the proper role for constitutional analysis in a case of this sort. Where a statute lends itself to only one reasonable interpretation then the court must adopt that interpretation. At that point, "[m]ere *doubts* about the constitutionality" of the statute "are not enough to override the legislature's intent." *Carlson*, 2014 UT 24, ¶ 25. "The only viable basis for doing that would be an actual determination of unconstitutionality." *Id.*

¶138   This court may ultimately be called upon to resolve the question of the constitutionality of the Inherent Risks of Skiing Act as applied here. I would leave this question open to the parties and the district court on remand, as it has not yet been presented to that court and we have no decision before us to review. If and when that question is raised and briefed we can consider whether the Inherent Risks of Skiing Act raises constitutional concerns. But the mere possibility of such concerns is not a basis for overriding the clear text of the statute.

B. *Stare Decisis*

¶139   The mere conclusion that a prior decision is incorrect is not enough to sustain a decision to set it aside. Instead we have long held that we overrule precedent only if the usual downsides of doing so are outweighed by significant upsides. *See Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 36, 275 P.3d 208.

¶140 Our most recent, comprehensive statement of our doctrine of *stare decisis* was in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. A key question under *Eldridge* is "how firmly" a line of "precedent has become established in the law since it was handed

down." *Id.* ¶ 22. In evaluating this question, we consider "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* We also assess "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Id.*[10]

---

[10] The majority alludes at length to the idea of "super *stare decisis*" for "statutory precedents." *Supra* ¶ 27 n.9. It cites precedent from a few state courts, a concurring opinion in this court, and a scholarly article by a law professor—all endorsing the view that statutory precedent is entitled to more weight than other precedent. And while acknowledging that this matter may be "an open question" in this court, the majority lauds the "force of the logic behind" this view. *Supra* ¶ 27 n.9. This is a significant move. It extends our law of *stare decisis* in a manner that a majority of this court has never endorsed, on which there is room for substantial disagreement. *See* William N. Eskridge, Jr., *Overruling Statutory Precedents*, 76 GEO. L. J. 1361, 1385 (1988) (noting that the "anchoring idea [of super *stare decisis*] has proven to be less than workable"); *see also* Frank H. Easterbrook, *Stability and Reliability in Judicial Decisions*, 73 CORNELL L. REV. 422, 429 (1988) (challenging the "shibboleth that it should be harder to overrule a statutory decision"). I would not endorse this notion.

This court has only ever applied a single, uniform standard. In statutory, common law, constitutional, and other cases we have consistently inquired into the same considerations addressed herein. *See, e.g., State v. Hansen*, 734 P.2d 421, 427 (Utah 1986) (overruling a statutory interpretation in *State v. Norton*, 675 P.2d 577 (Utah 1983) because it "construed the statute incorrectly and without benefit of briefing by the parties[,]" was a "recent [decision]," "the legislature ha[d] not relied upon it in enacting other statutes," and it "result[ed] in very poor public policy, policy the legislature could not have intended"); *State v. Mauchley*, 2003 UT 10, ¶11, 67 P.3d 477 (analyzing the common law "corpus delicti" doctrine under standard *stare decisis* standards); *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 16, 275 P.3d 208

(cont.)

Lee, A.C.J., dissenting in part

¶141   The point of this inquiry is to balance the important goal of maintaining stability in the law against our ongoing commitment to getting the law "right." The first-listed set of considerations is aimed at assessing the downsides of overruling precedent. If a law is working well in practice and sustains significant reliance interests, it may be costly to reform the law by overruling precedent. And that is a point favoring deference to precedent. The second consideration goes to the upside of overruling an erroneous precedent. The more clearly errant a prior decision, the greater the need to set it aside in advancing our commitment to the rule of law.

¶142   This is what our cases mean when they speak of more "good" than "harm" coming from overruling a prior opinion. *See Admiral Beverage*, 2011 UT 62, ¶ 36. The principal "harm" is in undermining stability of our law and reliance interests built around our precedent. So the argument for overruling a prior decision is strongest when the costs of overruling (from a reliance or stability standpoint) are low and the benefits (from a rule of law standpoint) are high. And that is the case here.

¶143 First, the usual costs of overruling precedent are diminished here because *Clover* is not deeply rooted in our law, is unworkable in practice, and does not sustain significant reliance interests. The inquiry called for in *Clover*—as to whether a given risk is one that skiers may "wish to confront"—does not lend itself to consistent, principled application. Indeed the *Clover* standard masks a latent ambiguity that invites arbitrariness. And that renders *Clover* more vulnerable under our doctrine of *stare decisis. See Eldridge*, 2015 UT 21, ¶ 43 (identifying the "fact-intensive" nature of an issue, the dearth of case law guidance, and the fact that

---

(assessing constitutional rule of eminent domain under standard principles of *stare decisis*).

There is an irony in the majority's application of the doctrine of *stare decisis*. The court is invoking the doctrine in the same case in which it is effectively overriding our longstanding approach to *stare decisis*. I would avoid that move. And I certainly wouldn't make it in a case in which the question is neither briefed by the parties nor necessary to our decision.

"trial courts and juries" are left "to make decisions that are effectively without guidance" as grounds for overturning precedent).

¶144 One formulation of the *Clover* inquiry would invite fact testimony and lay analysis—as to whether a given risk is one that a reasonable skier would "wish to confront." Yet this is an invitation for arbitrariness, and for overriding the clear terms of the statute. Many of the risks deemed "inherent" by the legislature are unlikely to be desired by many skiers. "[B]are spots," for example, are listed in the statute as an inherent risk of skiing, *see* UTAH CODE § 78B-4-402(1)(c), but many skiers likely would prefer not to "confront" them.[11] Other similar examples appear in the statute. *See* UTAH CODE § 78B-4-402(1) (listing many risks that many skiers undoubtedly would prefer not to confront, particularly when they result in injury, such as "changing weather conditions," "slush," "collisions with other skiers," and "the failure of a skier to ski within the skier's own ability"). So this inquiry opens the door for the factfinder to deem most any risk listed in the statute as one a reasonable skier would not wish to confront. And that would thoroughly defeat the clear terms of the statute.

---

[11] A contrary conclusion is also conceivable. Our prior cases have singled out "bare spots, forest growth, rocks, stumps, . . . lift towers and other structures" as risks skiers would not wish to confront. *White v. Deselhorst*, 879 P.2d 1371, 1375 (alteration in original) (abrogated on other grounds by *Penunuri v. Sundance Partners*, Ltd., 2017 UT 54, 423 P.3d 1150). But that will not hold for all skiers. Part of the allure of skiing is to confront (and avoid) all hazards and dangers that appear on the mountain—including trees and rocks and stumps. The advent of the "terrain park" illustrates that point. The whole point of the terrain park is to introduce hazards like "towers" and "structures" that skiers and snowboarders can confront. *See Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1146 (10th Cir. 2004) (describing a terrain park as being "designed for advanced skiers and snowboarders who choose to recreate in a very challenging risk-filled environment"). And this highlights the arbitrariness and unworkability of the *Clover* framework.

Lee, A.C.J., dissenting in part

¶145 Perhaps the use of expert testimony regarding what dangers are standard within the industry would remove some of the arbitrariness in the *Clover* analysis. Yet it is also likely that it would lead to the "dueling expert" trial, in which each side presents opinion testimony on whether the ski area in question lived up to industry standards. And that sort of inquiry would stretch the legal framework of the Inherent Risks of Skiing Act past its breaking point. The purpose of the statute, as noted, was "to establish as a matter of law that certain risks are inherent in" skiing, and to thus provide that "no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks." UTAH CODE § 78B-4-401. Those purposes would be thwarted by a legal framework that requires expert testimony to determine whether the risks presented at a given ski area are in line with an industry standard.

¶146 The "industry standard" inquiry is a matter for the law of negligence.[12] If the liability of a ski area operator for injuries

---

[12] *See, e.g.*, *Spafford v. Granite Credit Union*, 2011 UT App 401, ¶ 34, 266 P.3d 866 (affirming the dismissal of a premises liability negligence claim where there was "no expert testimony that the height of the curb or the slope of the asphalt 'violated any specific industry standards'" (citation omitted)) *abrogated on other grounds by Coroles v. State*, 2015 UT 48, 349 P.3d 739; *Hilliard v. Speedway Superamerica LLC*, 766 So. 2d 1153, 1155 (Fla. Dist. Ct. App. 2000) ("A breach of industry standards is evidence of negligence."); *Murphy v. Conner*, 646 N.E.2d 796, 798 (N.Y. 1994) ("Ordinarily, the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants." (citation omitted)); *cf.* RESTATEMENT (SECOND) OF TORTS § 295A (1965) ("In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them.").

resulting from risks listed as "inherent" were dependent upon a case-by-case assessment of the operator's compliance with industry standards, then the core premise of the Inherent Risks of Skiing Act would be defeated.

¶147 Neither variation on the *Clover* inquiry is accordingly viable. And absent some refinement or reformulation, our law under *Clover* leaves parties guessing about the likely outcome of a case filed under the Inherent Risks of Skiing Act. That is a hallmark of unworkability—and a basis for overruling *Clover* despite the deference that is normally owed to our precedent under the doctrine of *stare decisis*. *See Eldridge*, 2015 UT 21, ¶ 43 (overruling a legal standard in our precedent on the ground that it left fact-finders "without guidance" to make a highly "fact-intensive" determination).

¶148 This is one of the reasons we sought supplemental briefing from the parties in this case. The initial briefing left us without much guidance on the proper framework for assessing whether and to what extent a given risk is one that skiers may "wish to confront." And we accordingly asked the parties to advise us (a) on whether to retain or repudiate *Clover*, and (b) on how to frame the *Clover* inquiry into risks that skiers "wish to confront" in the event that we kept that standard in place. That briefing offered little help on the latter question. And the lack of a reasoned basis for distinguishing the two categories of risks identified in *Clover* is a basis for concluding that the standard established in that case is not just wrong but unworkable—and thus unlikely to sustain significant reliance interests.

¶149 The majority disagrees. Yet it has not offered an answer to the analytical puzzle left open by *Clover*—as to the means of assessing whether a given risk is one that skiers "wish to confront." Instead, the majority relies on a simple reformulation of the *Clover* test—substituting the word "expects" for "wish."[13] *Supra* ¶ 79. But

---

[13] The majority claims that this switch is justified by both *Clover* and the statutory text. Because the statutory list of inherent risks is "presented in an entirely unremarkable manner," *supra* ¶ 80, the majority concludes that the proper inquiry is whether the risk the

(cont.)

this does nothing to reduce the uncertainty generated by *Clover*. Our decision today will only perpetuate the uncertainty and continued litigation about the availability of immunity under the Inherent Risks of Skiing Act. We still have not explained how a court is to decide whether a given risk is one that a reasonable skier

---

skier encountered is one that she would "reasonably [have] expect[ed]" to encounter. *Supra* ¶ 79. This is so, the majority asserts, regardless of whether the risk is actually included in the statutory list.

Yet this move undermines the majority's resort to the doctrine of *stare decisis*. If the majority is seeking refuge in that doctrine it is in no position to reformulate its standards. (Once we start in that direction we are no longer following precedent—we are returning to first principles of statutory interpretation. And if we do that we will hardly end up at *Clover*.) "Reasonably expect to encounter" does not mean the same thing as "wish to confront." So the majority is substantively altering the legal framework set forth in *Clover*. The court says this alteration is permissible because it "effectively captures the legislature's intent." *Supra* ¶ 79. That may be. But it does not accurately capture *Clover*'s holding. Thus, despite much hand-wringing about the importance of precedent, the majority does violence to the *Clover* standard. It does so, quite clearly, by transforming a two-step subjective inquiry into a one-part objective one. *See supra* ¶ 80. Surely an objective test is not the same as a subjective inquiry. And a one-step test is different from a two-step one.

I suppose there is a sense in which the majority can claim that its entirely new formulation is a simple refinement of *Clover*. But that is only because neither test has any clear substantive content. As I explain in greater detail in Part II.D. below, the majority's test, like its *Clover* predecessor, is marked primarily by its extensive indeterminacy. Neither test is capable of generating remotely predictable outcomes. And in that sense I suppose we can say that the new test "does the same work" as the *Clover* test. *Supra* ¶ 79 n.27. We cannot properly say that the test is the same, however. Nor can we say how the test will play out in practice. The only thing litigants and lower courts can know for sure is that the statutory text doesn't matter.

70

might or might not "expect" to encounter on her journey down the slopes. And this is an open invitation for courts to enact their own judgment about what is "reasonable" into the law. The majority's failure to delineate an applicable rule of law based on *Clover*[14] further underscores the need for us to revamp our law in this area—and to bring it in line with the statutory text.

¶150   The majority offers a series of grounds for rejecting this conclusion. I find none of them convincing.

### 1. Unworkability

¶151   The majority responds to my concerns with the unworkability of the *Clover* test not by unraveling the unpredictability of the operative legal standard but by insisting that the absence of substantial appellate litigation in this area supplies conclusive evidence that *Clover* is workable. *Supra* ¶ 70.

¶152   But the premise of this argument is undermined by our cases. In *Eldridge* we overturned a longstanding element of our law of intentional interference with contractual relations—set forth in *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982). In so doing we were not deterred by the fact that our precedent in this area had not "generated substantial appellate litigation."[15] We simply analyzed the legal standard we were repudiating—an option to establish intentional interference upon proof of a defendant's "improper purpose"—and opined that this standard was too unpredictable to be a workable precedent. *See Eldridge*, 2015 UT 21, ¶ 43. We noted, specifically, the "fact-intensive" nature of the improper purpose standard, the lack of a predictable

---

[14] *See infra* Part II.D.

[15] The majority cites a lack of appellate litigation as an indication of workability. *Supra* ¶ 70. But I see no reason to draw any inference of workability from the mere lack of appellate case law. It is easy to think of other explanations for the lack of appellate litigation. The parties to these cases may just be generally settling, rather than trying, their claims. And that would make sense if the *Clover* standard is unpredictable and does not lend itself to summary disposition.

standard for implementing it in the case law, and the fact that "trial courts and juries" are left "to make decisions that are effectively without guidance" as grounds for overturning precedent. *Id.*

¶153   In a sense, moreover, we have "evidence" that the *Clover* standard is unworkable—no party has been able to propose a way to consistently apply it. We requested supplemental briefing from the parties on how courts could determine whether a risk is one that "skiers wish to confront." The parties could not identify a workable standard. And the majority has not proposed one either. So if this court cannot identify the factors lower courts should apply to determine whether a risk is one skiers "wish to confront," we cannot expect the standard to suddenly become workable in practice on remand.

(a) Decisions in Other Jurisdictions

¶154   The majority also seeks to sustain the workability of the *Clover* framework by citing decisions from other states. Supra ¶¶ 59-60, 72. The majority cites *Bouchard v. Johnson*, 555 N.W.2d 81 (N.D. 1996); *Kopeikin v. Moonlight Basin Management, LLC*, 981 F. Supp. 2d 936 (D. Mont. 2013); and *Nutbrown v. Mount Cranmore, Inc.*, 671 A.2d 548 (N.H. 1996), as evidence of *Clover*'s workability.

¶155   None of these cases sustains the workability of the *Clover* decision, however. The statutory schemes in each of these cases are distinct from our Utah statute. And none of these cases endorses the *Clover* notion of two new categories of inherent risks, framed by a determination of whether skiers "expect to confront" them. Nor do they, accordingly, pave a path for a workable analysis of the "expect to confront" standard.

¶156   The *Bouchard* decision cites the operative standard set forth in *Clover* but it does not adopt it. The "'proper standard'" endorsed by *Bouchard* is not the *Clover* framework. It is this:

> There should be no liability for a ski area operator if the design of the ski run creates natural conditions, necessary to the enjoyment of the sport, and the design is so obviously dangerous the skier assumes the risk. Conversely, if the design problem was created by the operator's negligence and was not an

inherent risk associated with the sport, liability for the operator should exist.

555 N.W.2d at 85.

¶157   This is not *Clover*. This is not a decision that overrides a statutory list of inherent risks of skiing and replaces it with a new set of categories turning on a determination of which risks skiers "wish to confront." It is simply a restatement of the operative statutory standard. The North Dakota statute is distinct from our Utah statute. It begins with an extensive list of "'duties'" that "'[e]very ski operator shall have . . . with respect to the operation of a skiing area,'" and then proceeds to state that skiing is "'hazardous . . . regardless of all feasible safety measures which can be taken,'" and thus that "'[e]ach skier expressly assumes the risk of'" injuries resulting from enumerated inherent risks of skiing. *Id.* at 83 (quoting North Dakota statute). In context, then, the "proper standard" endorsed in *Bouchard* does not at all sustain the viability of the *Clover* standard. It undermines it—in the sense that *Bouchard* simply follows the operative statutory framework (while *Clover* overrides it).

¶158   The *Kopeikin* decision is similarly unhelpful to the cause of retaining *Clover*. The Montana statute at issue in *Kopeikin* is like the North Dakota statute in *Bouchard*. It not only identifies "inherent risks" for which ski area operators are immune, but also "provides a non-exclusive list of duties for ski area operators." *Kopeikin*, 981 F. Supp. 2d at 942 (citing statute). This statutory provision, moreover, came about as a result of a Montana Supreme Court decision striking down a prior statute that, like our Utah statute, imposed a clear bar on ski area operator liability in certain circumstances. *See Brewer v. Ski-Lift, Inc.*, 762 P.2d 226 (Mont. 1988) (holding that "a fair reading" of the Montana statute "prohibits the skier from obtaining legal recourse against an operator even if the injury is proximately caused by the negligent or even intentional actions of the operator," but holding that the statute was overbroad and unconstitutional). In this sense the Montana line of cases actually undermine *Clover*. If we were to follow the Montana lead, we would give effect to the plain language of the Utah statute and then consider a constitutional challenge to the statute. We would

not override the terms of a clear statute with an "inherent risk" framework of our own making.

¶159 The *Kopeikin* decision does cite and endorse *Clover* to some degree. *See Kopeikin*, 981 F. Supp. 2d at 944–45. It ultimately denied a motion to dismiss the complaint—even though the complaint was asserting claims based on an injury that was caused by a danger the Montana statute deemed "inherent" in skiing. *Id*. at 945. But the *Kopeikin* decision does nothing to clarify the *Clover* framework or to reinforce its workability. *Kopeikin* just kicks the can down the road on the operative issue under *Clover*—holding that at the pleading stage "all facts alleged must be treated as true and construed in the light most favorable to the plaintiff," and noting that the risk at issue was not "inherent" "[a]ccording to the allegations in the Complaint, which is all the Court had before it at th[at] time." *Id*. Thus, *Kopeikin* comes as close as any of the cited cases to supporting *Clover*; but it ultimately tells us nothing about the workability of the *Clover* standard.

¶160 The *Nutbrown* decision is also unsupportive of the viability of the *Clover* standard. *Nutbrown* cites *Clover*. *See Nutbrown*, 671 A.2d at 680. But it nowhere endorses the framework of the *Clover* decision. And again the statute at issue is distinct from our Utah statute. The New Hampshire statute at issue in *Nutbrown* is like the North Dakota and Montana statutes: It begins with an express list of duties of ski area operators, and only then provides that "[e]ach person who participates in the sport of skiing accepts as a matter of law, the dangers inherent in the sport." *Id*. at 679-81 (citing New Hampshire statute). The *Nutbrown* holding, moreover, gives express effect to the plain terms of the statute—and nowhere endorses the gloss on statutory risks set forth in *Clover*. Thus, *Nutbrown* cites *Clover* only for the proposition that "[t]he statute does not purport to immunize a ski area operator for injuries caused by the operator's own negligent or intentional acts." *Id*. at 680. And it ultimately gives effect to the statutory scheme. It holds that the plaintiff stated a viable claim arising from the ski area operator's failure "'to properly mark' the beginning of a trail" because that involved the breach of a duty set forth by statute, but that plaintiff's other claims all involved "allegations of fault and causation [that] were inherent risks of skiing and thus [were] not

actionable." *Id.* at 683. Thus, if anything *Nutbrown* undermines *Clover*; it does so by following the operative statutory scheme instead of replacing it with a new "inherent risks" standard of a court's own making.

¶161   For these reasons the majority's cited cases do nothing to sustain the viability of the *Clover* framework (or the puzzling modification made thereto today). In many ways these cases undermine the decision we reconsider today. And other courts have done so more forthrightly. The strongest case on point is *Glover v. Vail Corp.*, 955 F. Supp. 105, 108–09 (D. Colo. 1997). The *Glover* court was applying a Colorado statute that is closely parallel to our Utah Act — a statute that "states unequivocally that 'no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing," which included "collisions with other skiers." *Id.* at 108. In *Glover* the plaintiff sought to recover from a ski area operator for an injury resulting from a collision with another skier. The *Glover* court dismissed the claim on summary judgment, holding that the statutory language was plain and the court had no license to "alter its terms." *Id.* at 107. In so doing the court discussed and rejected the *Clover* framework. The *Glover* court found the *Clover* framework "flawed," noting that it "transform[ed]" a statutory standard of "inherent risks" into "mere suggestions of what risks *might be*" integral, and concluding it stemmed from this court's apparent "dissatisf[action] with" the effect of the statutory scheme. *Id.* at 108-09.

¶162   The *Glover* court's concerns are also reiterated in *Hanus v. Loon Mountain Recreation Corp.*, No. 13-CV-44-JL, 2014 WL 1513232, at *5 n.5 (D. N.H. Apr. 16, 2014). The *Hanus* court reached the same conclusion. It rejected *Clover* on the basis of the *Glover* critique. *Id.*

¶163   The majority's approach thus finds very little support in the precedents of other jurisdictions.

### (b) Legislative "Endorsement" of *Clover*

¶164   The majority also asserts that there is reason to conclude that the legislature has acquiesced in or endorsed our decision in

*Clover.* In the majority's view, our "legislature has had at least two opportunities to overrule the core holding of *Clover*" in the years since that decision. *Supra* ¶ 64. And because the legislature has not acted, the majority sees "good reason to continue to accord *Clover* weighty *stare decisis.*" *Supra* ¶ 66.

¶165 I see no good reason for this kind of inference. Legislative inaction may be the result of any of a number of factors—unawareness of a judicial decision, a lack of legislative inertia to address such a decision, the absence of consensus on a means of overriding such a decision, or a range of other circumstances. None of these circumstances indicate legislative acquiescence. And it is sheer speculation to assume the contrary.[16] This legislative silence, moreover, does nothing to salvage the unworkable *Clover* framework.

¶166 The decision of the legislature that enacted the Inherent Risks of Skiing Act is entitled to respect. Subsequent legislatures, moreover, have no authority to amend the work product of a prior legislature *except* by enacting actual legislation. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) ("Congressional inaction cannot amend a duly enacted statute.").

¶167 U.S. Supreme Court authority reinforces these conclusions. That court has frequently cautioned that "[w]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) (Frankfurter, J.). Thus, the Court has

---

[16] The idea that legislative endorsement can be inferred from legislative inaction has long been criticized. *See, e.g., Zuber v. Allen*, 396 U.S. 168, 185 & n.21 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route."; "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."); *Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law."); *Helvering v. Hallock*, 309 U.S. 106, 119–20 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities.").

emphasized that "[i]t does not follow . . . that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it." *Patterson*, 491 U.S. at 175 n.1. "It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation." *Id.* (internal citation and quotation marks omitted).

¶168  The legislative history cited by the majority, *see supra* ¶65, is no answer to these concerns. At most, the majority has identified a statement by a single member of the 2006 legislature indicating his view that the 2006 amendment to the Inherent Risks of Skiing Act would not "exempt the negligence of the ski resort" from liability in certain circumstances. *Supra* ¶ 65. But that is insufficient for numerous reasons. For one thing, the views of a single member of the legislature have no power to bind the whole body. For another, the 2006 legislature cannot override the views of the 1979 legislature (which enacted the Inherent Risks of Skiing Act) without repealing the statute. The legislature as a body expresses its views only by voting a bill into law. *See Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶¶ 64, 67, 345 P.3d 619 ("Legislative history is not law. . . . [T]he governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment."); *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766 ("Our evaluation of the statute's purpose must start with its text, not the legislative history."). And the statement made by Senator Hillyard on the Senate floor was never voted into law. It accordingly tells us nothing of relevance to the question presented.

¶169  Even if this kind of statement could tell us something of relevance about this question, *this* statement actually cuts the other way when Senator Hillyard's comments are considered in context. The statement reads in part:

> Now, I should indicate that there's no intention in this to exempt the negligence of the ski resort. *In other words, if they have an employee running a trail groomer and they run somebody over, that's ordinary negligence.* We're just talking about the inherent risk when people go skiing. . . .

> People say, you know, I'm a trial lawyer, why am I carrying a bill like this? And the reason I am is because I think *the state made the policy in the 1980s that this is a policy of the state of Utah.* And I think for everyone involved we should just [ ] keep up to date and clarify that policy. And so that's what we've done is [ ] *taken those words* and [ ] *give them better definitions and more specificity.*"

Recording of Utah Senate Floor Debates, 56th Leg., Gen. Sess. (Feb 13, 2006) (statement of Sen. Lyle Hillyard) (emphasis added).

¶170 There are two important points to highlight. First, Senator Hillyard's example of ski resort negligence is beyond the bounds of the enumerated inherent risks. Senator Hillyard could have used an example that supports the majority's interpretation. He could have said that even though impact with signs or fences is listed as an inherent risk of skiing, a skier could still recover where the ski resort had been negligent in placing that sign or fence. But instead he used an example of negligence of an employee "running a trail groomer." That is not an inherent risk of skiing enumerated in section 78B-4-402.[17]

¶171 Second, not only does Senator Hillyard fail to mention *Clover*; he also endorses the "policy" that the "state made . . . in the 1980s," which he characterizes as the "policy of the state of Utah." Perhaps Senator Hillyard is thinking about this policy with the *Clover* overhaul in mind. But there's nothing in his statement to suggest that. And the context of the statement cuts the other way. Hillyard harkens back to the "policy" that the "state made in the 1980s," not the common law developments since that time. And he states the purpose of proposing an amendment to "take [the statute's] words and [ ] give them better definitions and more specificity." There is no real point to clarifying the definitions of the

---

[17] Utah Code section 78B-4-402 lists as one of the inherent risks of skiing "variations or steepness in terrain, whether natural or as a result of slope design, snowmaking or grooming operations." But this does not say that grooming operations are an inherent risk; only that variations in terrain resulting from such operations are.

items on the statutory list under *Clover*; that decision renders the statutory list irrelevant. So if anything Hillyard's comments seem to reinforce the statutory standard—not the *Clover* rewrite.

### 2. Reliance

¶172 The majority's final point is the assertion that a decision to overturn *Clover* might upset significant reliance interests. Here the majority suggests that ski resorts may have "invested in infrastructure and personnel to abate potential negligence actions under *Clover*," that "insurers and resort owners" may have "negotiated policies and premiums against the backdrop of *Clover*," and that Utah ski resorts "may have obtained" a commercial advantage by attracting skiers with the allure of a more friendly tort system. *Supra* ¶ 68.

¶173 I cannot dispute that there may be some degree of disruption in a decision to overturn *Clover*. But a decision to overrule precedent will always have some effect. That alone cannot be enough to sustain a precedent that is both clearly incompatible with the controlling statute and unworkable in its application. *See State v. Robertson*, 2017 UT 27, ¶¶ 31–34, 438 P.3d 491 (overturning precedent after considering "the plausibility of the existing interpretation" and whether the interpretation "has worked in practice").

¶174 This holds even when we can identify some reliance interests built up around our precedent. A decision like this one is always a balancing act. I acknowledge that there are some downsides to setting aside *Clover*. But I would nonetheless overrule it because the significant upsides substantially outweigh the downsides.

¶175 Perhaps it's true that ski resorts, insurers, and even skiers rely to some degree on the *Clover* framework. But these reliance interests are minimal. Ski resorts likely have negotiated insurance premiums with *Clover* in mind, but their reliance interests cannot be harmed by following the language of the statute, which severely *limits* liability. And nothing in our opinion would inhibit a resort from independently compensating injured skiers if in fact they

receive more business on account of Utah's increased "incentive[s] to ski in the state." *See supra* ¶ 68.

¶176 Rutherford's reliance interests—as well as those of similarly situated skiers—are minimal. This is so because an unworkable precedent is unlikely to sustain the same kind of reliance interests as a decision establishing a clear, bright-line rule. When a decision is unworkable, litigants will struggle to predict its application, and thus to rely on its operation. No one can anticipate the effects of *Clover* in difficult cases because the standard is stated in such ambiguous terms.

¶177 And overturning Clover has significant upsides. We can be faithful to the governing statute while reducing confusion by implementing a framework that is predictable in its application.[18]

## C. Remand

¶178 For all of the above reasons I would conclude that *Clover* is ripe for reconsideration. And I would repudiate it on the ground that it is clearly incompatible with the statutory scheme enacted by the legislature.

¶179 That takes us back to square one. And square one in a statutory case is always the statutory text. The text of the statute is the law. *See Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619 ("The governing law is defined . . . by the statutory text that survived the constitutional process of bicameralism and

---

[18] The majority says that even if it were true that *Clover* had generated minimal reliance interests, it wouldn't matter because "Talisker has not made this argument" and the "burden of persuasion is Talisker's to bear." *Supra* ¶ 68 n.25. I see no relevance to the lack of briefing on this specific argument. "It is no affront to the adversary system for us" to engage in independent analysis on issues preserved and presented by the parties for our decision. *State v. Rasabout*, 2015 UT 72, ¶ 98, 356 P.3d 1258 (Lee, A.C.J., concurring in part and concurring the judgment). The judicial enterprise would be impoverished if we were to mindlessly limit ourselves only to the specific arguments of the parties. In this instance I see no reason to refrain from engaging in my own independent thinking on the reliance issue.

presentment."). That text governs—without any need for elaboration or consideration of other sources—so long as it is plain. *Id.* ¶ 64 (explaining that we look beyond the text to "inform[] our construction of ambiguities in the law," "[b]ut its utility ends there").

¶180 Here the statute is plain. It speaks in broad, categorical terms. It says that "no skier may make any claim against, or recover from, any ski area operator for injury resulting from any of the inherent risks of skiing." UTAH CODE § 78B-4-403.

¶181 This is the operative legal standard. Under the Inherent Risks of Skiing Act, a skier's tort claim is statutorily barred if it is (a) for an "injury resulting from" (b) "any of the inherent risks of skiing." These are questions of causation. *See Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶¶ 36–37, 353 P.3d 140 (describing "result from" language in a statute as a "causation standard"). The first inquiry concerns the causal connection between the skier's injury and an alleged risk of skiing. The next question is whether the risk of skiing qualifies as an "inherent risk of skiing" under the statute.

¶182 That is purely a question of statutory interpretation. The statute defines inherent risks of skiing and includes a list of such risks. UTAH CODE § 78B-4-402(1). If a skier's injury is causally connected to that risk and the risk qualifies as an "inherent risk of skiing" under the statute then the plaintiff's claim is statutorily barred. The statute leaves no room for any inquiry into whether the risk in question is one that skiers might wish to confront, or any of the related elements of the *Clover* analysis. It does, however, leave open the question whether the injuries at issue here resulted from a risk encompassed within the ordinary meaning of the terms of the statute.

¶183 I would remand for further proceedings under that standard. Talisker asserts that the snow that caused Levi Rutherford's injury was an "inherent risk of skiing" under the terms of the statute. It notes that the statute lists "snow or ice conditions" as an inherent risk of skiing, *Id.* § 78B-4-402(1)(b), and that "machine-made snow" counts as a "snow or ice condition[]" that is an inherent risk. *Id.* Talisker also emphasizes that inherent risks also include "variations or steepness in terrain, whether

natural or as a result of slope design, snowmaking or grooming operations." *Id*. § 78B-4-402(1)(d).

¶184 Talisker may well be entitled to summary judgment under the ordinary meaning of these terms of the statute. But the Rutherfords have not had an opportunity to present an argument that the snow and ice conditions in question do not fall within the statutory terms. And this question has never been decided by the district court. We should remand to allow that court to resolve this issue in the first instance.

### D. The Majority's Standard

¶185 The majority claims to "clarify" the holding in our *Clover* opinion. *Supra* ¶ 12. But the majority's standard is hardly clear. Quite the contrary. The court seems to articulate two alternative standards—without committing itself clearly to either, and without explaining how either should play out in practice.

¶186 At times the court seems to be thinking of an "inherent risks of skiing" inquiry that is framed as a question of law, turning (at least in part) on the ordinary meaning of the text of the statute. This is arguably implied by the court's assertion that its test "track[s] the commonplace descriptions of risks" set forth in the statute, *supra* ¶ 82, and requires a consideration of the unadorned terms of the listed risks in the manner that a "skier would reasonably expect to encounter [them] while skiing," *supra* ¶ 81. This seemingly legal inquiry suggests that a ski resort would be entitled to immunity under the statute if an injury results from a listed risk "when" it is "encountered in the way that skiers would reasonably expect to encounter" it.[19] *Supra* ¶ 79.

---

[19] At various points the majority claims confusion over the standard that I would apply. Let me allay any possible confusion here. My approach turns on a simple, straightforward question of law—of statutory interpretation (of risks listed in the statute). Thus, I would ask whether any given injury resulted from a risk that falls within the ordinary meaning of the terms of the statute. I would ask, for example, whether an injury results from "snow or ice conditions," or "impact with lift towers." UTAH CODE § 78B-4-402(1). I would accordingly use our standard tools of

(cont.)

¶187 Elsewhere, however, the court seems to speak of the *Clover* inquiry in terms that contemplate a fact-intensive mixed question. Quoting *Clover*, the majority says that "'[c]ourts cannot determine that a risk is inherent in skiing simply by asking whether it happens to be one of those listed in'" section 402 of the statute. *Supra* ¶ 79 n.27. "Instead," the court says that we must ask (even for injuries arising from risks listed in the statute) whether the risk "was an integral part or essential characteristic of the sport of skiing"—an inquiry that seems to contemplate a fact-intensive determination of whether the particular circumstance of the injury is one that "a skier . . . reasonably expects to encounter." *Id*. This also seems reflected in the question that the majority frames for the district court on remand: "whether a skier would reasonably expect to encounter the wet, sticky snow that [Rutherford] encountered at The Canyons." *Supra* ¶ 83.

¶188 The majority's discussion of the statute's treatment of "impact[s] with lift towers" (a risk identified by the legislature as "inherent," UTAH CODE § 78B-4-402(1)(e)) highlights the internal tension in the majority's approach.[20] The court first says that "[t]he

_____

statutory interpretation to resolve the question presented in a case like this one.

[20] I have no quarrel with the majority's general premise that a factual inquiry may sometimes be a necessary predicate to a legal determination made by a court as a matter of law. But this does not rehabilitate the majority opinion. The problem is not that legal questions can never call for antecedent factual inquiries. It is that the legal determinations prescribed by the Inherent Risks of Skiing Act—establishing that "certain risks are inherent" in skiing "as a matter of law," UTAH CODE § 78B-4-401—do not call for a predicate factual inquiry.

The majority eventually gets around to addressing this point. But its only response is the suggestion that the statute's reference to "certain risks" may not be a "reference to the enumerated risks" set forth in the statute. *Supra* ¶ 79 n. 28. And I see no way to defend that conclusion here. In context, it is quite clear that the whole point of the statutory list is to identify those risks that are "inherent" as a matter of law. *See* UTAH CODE § 78B-4-401

(cont.)

relevant inquiry in a case involving an impact with a lift tower is whether the legislature meant for the Act to cover *the kind of impact* with a lift tower at issue in the case." *Supra* ¶ 81 (emphasis added). And it says that the statute "bars recovery" for claims by skiers who "ski[] out of control and crash[] into an *ordinary* lift tower." *Supra* ¶ 81 (emphasis added). This sounds like the framing of a legal question—as to the ordinary meaning of the language of the statute. Yet the court never establishes this as the governing legal standard. In fact it seems to take back the framing of a legal question in the same paragraph of the opinion, where it asserts that the statute should be understood to "bar[] recovery for impacts *as skiers would reasonably expect them to occur*." *Supra* ¶ 81. This, again, seems more of a factual inquiry.

¶189 The fact-intensive nature of the court's standard seems reinforced elsewhere in the opinion where the majority analyzes the "pile of rocks" hypothetical. *Supra* ¶ 43. There the court concludes (wrongly in my view—*see supra* ¶¶ 131-32) that a "pile of rocks intended for later landscaping placed in the middle of a beginner run . . . is certainly a 'surface . . . condition[] such as . . . rocks" within the ordinary meaning of the" statutory text. *Supra* ¶ 43. Yet the majority suggests that this would fall outside the "inherent risks" covered by the statute—presumably because (in the court's view) a reasonable skier would not "expect to confront" these sorts of "rocks." This is consistent with the majority's assessment of another hypothetical—the "twenty-yard bare spot running through the middle of a groomed ski run." *Supra* ¶ 43 n.15. On this hypothetical the court accepts the notion that this "is a 'bare spot[]' under ordinary meaning analysis." *Supra* ¶ 43 n.16. But it again suggests that its *Clover* reformulation would allow our courts

---

(emphasizing that the statute's purpose is to "establish as a matter of law that certain risks are inherent in th[e] sport"); *id.* § 78B-4-402(1) (indicating that listed risks are "includ[ed]" in the "dangers or conditions which are an integral part of the sport of . . . skiing"). The legislature certainly could have indicated that inherency is a legal determination to be made after predicate factual findings. But it clearly did not do so. And we should honor the framework established by the legislature instead of formulating a new one.

to uphold a skier's right to sue on an injury caused by such a bare spot—again presumably because a purportedly reasonable skier would not "expect to confront" it.

¶190 For these reasons I read the majority opinion to eschew a legal construct of "inherent risks" rooted in a question of statutory interpretation and to endorse a free-ranging, fact-intensive inquiry into what a reasonable skier would "expect to confront." Yet I also have no idea what either test would entail in practice. And I grieve for the trial judge or litigant who is left to decode the tea leaves we leave on this question in our opinion.

¶191 The court's framing of a quasi-legal inquiry leaves several key questions unanswered. If the law requires us to ask whether a given injury resulted from a risk that is "encountered *in the way* that skiers would reasonably expect to encounter them," *supra* ¶ 79 (emphasis added), we must identify what counts as part of the relevant "way." Consider the court's lift tower analysis. The court says we should ask whether "the legislature meant for the Act to cover the kind of impact with a lift tower at issue in the case." *Supra* ¶ 81. But to answer that question we would have to identify which elements of the impact with the lift tower are of relevance to the inquiry. And we would then have to guess whether the legislature meant to cover that risk under the immunity provided to ski resorts.

¶192 Imagine an accident involving a collision with a lift tower that is alleged to have been negligently designed or placed by the ski resort (a scenario much more likely to come to pass than the "invisible" lift tower). How is a court to decide whether this lift tower is "encountered in the way that skiers would reasonably expect to encounter" it? The plaintiff will inevitably say that a reasonable skier would not expect to encounter it in this "way" because this is a negligently designed or placed lift tower. And that will open the door to expert testimony about lift tower design and placement, rendering the statutory list inoperative and effectively reinstating a negligence regime.

¶193 The court's factual framing of the inquiry is equally opaque. Nowhere does the majority tell us what it means for a reasonable skier to "expect" a certain risk. In some sense no one

85

"expects" to encounter any sort of mishap that occurs on the ski hill. Any ski injury is in a very practical sense an "accident"—something *unexpected*. *Accident*, BLACK'S LAW DICTIONARY (11th ed. 2011) (defining an accident as something "unintended and unforeseen"). For this new test to do any work, then, we have to identify the quantum of expectation that we have in mind—how likely the expectation must be. The court nowhere does that.

¶194   And that is just the beginning of the problem. We also have to identify which aspects of the risk or resulting injury must be "expected." And finally, and quite importantly, we must determine whether and to what extent expert testimony is required to satisfy our new standard of expectation.

¶195   The majority specifies none of this. It fails to identify a clear standard. And it leaves unanswered the key questions required to make sense of the two competing tests it has alluded to. Instead it just frames a muddled question for remand, hoping the district court and the parties will figure it all out later.

¶196   We can do better. The path to doing so is to return to the plain text of the governing statute. I would take that route. I would ask the court on remand to decide whether Levi Rutherford was injured by an inherent risk that falls within the ordinary meaning of the statutory text. That inquiry resolves all of the many practical problems with the majority's standard. And it also paves a path to deal with the various absurd hypotheticals imagined by the majority.

### III. CONCLUSION

¶197   This case has occupied the attention of the Utah appellate courts for the past four years. We granted *certiorari* because we perceived a need to bring clarity to a legal regime that has drawn skepticism and concern since its inception, and that has long stood in need of clarification. And we ordered supplemental briefing and heard oral argument on the case three times, again because we saw a pressing need for a substantial overhaul of the law in this area.

¶198   In light of this extensive history, the bench and bar will be justifiably disappointed in our disposition of this case. Instead of clarification or reformulation, the majority mostly just kicks the can

down the road. It replaces one indecipherable test with another, and leaves our law in a state of disarray. This is what happens when we ignore the plain language of the law and venture into the territory of judicial rewriting of legislation. I see no reason to condone our past endeavors of this sort. And I certainly don't think it's a good idea for us to double-down on our past missteps with a new test that is equally problematic.

¶199   I dissent. I would credit the text of the Inherent Risks of Skiing Act. I would overrule *Clover*, and in so doing affirm that our job is to interpret statutes, not rewrite them.

———————